IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

JUL 3 1 2006

LUTHER D. THOMAS, Clerk
By: _____ Deputy Clerk

SECURITIES AND EXCHANGE
COMMISSION,

        Plaintiff,

v.

JOHN P. MILLER,

        Defendant.

CIVIL ACTION NO.

1:04-CV-1655-JEC

## ORDER & OPINION

This case is presently before the Court on Defendant John P. Miller's Motion for Summary Judgment [25] AND Securities and Exchange Commission's Motion to Deem as Admitted Its Statement of Additional Material Facts and Supporting Memorandum of Law [49]. The Court has reviewed the record and the arguments of the parties and, for the reasons set out below, concludes that Defendant John P. Miller's Motion for Summary Judgment [25] should be **GRANTED in part and DENIED in part,** AND Securities and Exchange Commission's Motion to Deem as Admitted Its Statement of Additional Material Facts and Supporting Memorandum of Law [49] should be **DENIED.**

## BACKGROUND

This case is presently before the Court on defendant's motion for partial summary judgment.  Defendant, John P. Miller, asks this Court to find that plaintiff, the Securities and Exchange Commission ("SEC"), is precluded from seeking civil penalties and disgorgement from defendant.

## I.    Plaintiff's Motion to Deem Certain Facts Admitted

Plaintiff asks this Court to deem as admitted the statement of additional material facts filed by plaintiff in support of its response to defendant's motion for partial summary judgment.  As grounds for deeming these facts admitted, plaintiff relies on defendant's failure to respond to plaintiff's statement of additional material facts. (SEC's Mot. to Deem as Admitted, etc. ("Mot. to Deem") [49] at 1-2.)  Consequently, before engaging in any analysis or a more detailed recitation of the facts of this case, the Court must first determine what facts it will consider in ruling on summary judgment.

In response to plaintiff's motion, defense counsel admits that he failed to respond to plaintiff's statement of additional material facts.  Defense counsel explains that he did so because he was unknowingly relying on an old version of the local rules of this Court that did not reflect the January 4, 2005 revisions to L.R. 56.1, NDGa. (John P. Miller's Resp. to SEC's Mot. to Deem as

2

Admitted, etc. ("Resp. to Deem") [50] at 3-4.) Under the former L.R. 56.1, NDGa, a party moving for summary judgment was required to include with its motion a statement of material facts to which the movant contended there was no genuine issue to be tried.  The respondent was then required to attach to its response to the motion a response to each of the movant's numbered material facts and a statement of material facts to which the respondent contended there was a genuine issue to be tried.  No further responsive statement from the movant was required.

The January 2005 revisions to L.R. 56.1, NDGa, now require the movant to reply to the statement of additional facts filed by the respondent.  Unaware of the change in L.R. 56.1, NDGa, defense counsel failed to respond to plaintiff's statement of additional facts.  By affidavit, defense counsel testifies that he became aware of the change in L.R. 56.1, NDGa, only after reading plaintiff's motion to deem as admitted its statement of additional material facts on January 9, 2006. (*Id.* at 4.)  Defendant asks the Court to excuse its error and accept defendant's response to plaintiff's statement of additional facts filed on January 13, 2006, only ten days after defendant filed the reply brief that should have included defendant's response to plaintiff's statement of additional facts. (*Id.* at 3.)

Defendant should have filed his response to plaintiff's statement of additional facts on January 3, 2006, the date defendant

3

filed his reply.  Defendant did not actually do so until January 13, 2006.  Still, because the Court concludes that neither party has been prejudiced by the delay, the Court will accept defendant's late response.  Accepting defendant's response will provide the Court with a more complete and accurate picture of the disputed and undisputed facts at issue in the present action.  Accordingly, the Court **DENIES** Securities and Exchange Commission's Motion to Deem as Admitted Its Statement of Additional Material Facts and Supporting Memorandum of Law [49].

## II.   Factual Background

The bulk of the events that give rise to the present action occurred in 1999.  During 1999, defendant was the Chief Executive Officer, President, and Chairman of the Board of Master Graphics, Inc. ("Master Graphics").  (Def. John P. Miller's Statement of Undisputed Material Facts, etc. ("Def. SUMF") at ¶ 2; Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts ("Pl.'s Resp. SUMF") at ¶ 2.)  From 1997 until 1999, Master Graphics acquired a series of printing companies located throughout the United States.  After they were acquired, these printing companies became Master Graphics "divisions." (*Id.* at ¶ 3.)  For most of these transactions, the former owners became employed by Master Graphics as division presidents. (*Id.* at ¶ 4.)  Most of the division presidents retained ownership of the property which housed the printing companies that

4

they had once owned.   As part of the acquisition deal, Master
Graphics then leased the property for the various divisions from the
division presidents. (*Id.* at ¶ 5.)

### A.   Master Graphics' SEC Filings and Press Releases

In its Complaint, filed on June 8, 2004, plaintiff alleges that
sometime in 1999 defendant approached the division presidents about
a plan to reclassify their rent and salary payments for the first
quarter of 1999 as prepaid expenses or receivables.   The plan was
known as the "Salary and Rent Incentive Plan" ("SRIP"). (*Id.* at ¶ 6.)
The concept of SRIP was known and discussed internally among Master
Graphics' employees during April and May of 1999. (*Id.* at ¶ 7.)
Though none of the Master Graphics' employees deposed in this case
can recall the specific date, all of those deposed except for one
division president agree that SRIP was formally proposed sometime
prior to June 8, 1999.[1] (*Id.* at ¶ 8.)   Internal documents and entries
in Master Graphics' internal accounting records necessary to reflect
SRIP were generated prior to June 8, 1999. (*Id.* at ¶ 10.)

On May 6, 1999, Master Graphics' share price closed at $6.0625.
(Pl.'s Statement of Additional Facts ("Additional Facts") [29] at ¶
22.)   On May 10, 1999, the investment firm of Morgan Keegan confirmed
that Master Graphics' first quarter results met estimates and

---

[1]   Division president David Sutherland cannot remember when the
SRIP discussions occurred. (Pl.'s Resp. SUMF at ¶ 7.)

AO 72A
(Rev.8/82)

maintained both the "outperform" rating and the earnings target for the second quarter. (*Id.* at ¶ 23.)  On May 17, 1999, Master Graphics filed the first Form 10-Q that plaintiff alleges was affected by SRIP.[2] (Def. SUMF  at ¶¶  11-12; Pl.'s Resp. SUMF at ¶¶ 11-12.) Plaintiff  contends  that  the  purpose  of  the  SRIP  had  been  to manipulate  expenses  in  order  to  allow  Master  Graphics  to  meet industry analysts' expectations for first quarter earnings for the period ending March 31, 1999.  Plaintiff contends that the SRIP accomplished this goal by decreasing salary and rent expenses, thereby causing an increase in Master Graphics' net income as reported in its May 1999 Form 10-Q. (*Id.* at ¶ 12.)  Though defendant has  reserved the right to challenge plaintiff's exact figures, plaintiff's expert concluded that this reclassification of salary and rent expenses caused Master Graphics' May 1999 Form 10-Q to overstate the company's pretax earnings by approximately $896,000, or 68%. (Additional Facts at ¶ 13.)

Master  Graphics  did  not  reference  or  disclose  its reclassification of rents and salaries as assets (a/k/a SRIP) in its May 1999 Form 10-Q. (*Id.* at ¶ 2.)  Similarly, Master Graphics did not

[2]  A Form 10-Q is a financial form that includes a company's unaudited financial statements.  It provides a continuing view of a company's financial position during the year.  A publicly traded company is required to file a 10-Q for each of the first three quarters  of  its  fiscal  year.  ("Form  10-Q"  available  at http://www.sec.gov/answers/form10q.htm, last accessed July 25, 2006).

mention its reclassification of rents and salaries as assets in its May 6, 1999 press release announcing first quarter earnings. (*Id.* at ¶ 3.)   During 1999, Master Graphics also failed to disclose the reclassifications to the Morgan Keegan analyst who covered the company. (*Id.* at ¶ 8.)   Plaintiff contends that Master Graphics was required to disclose the reclassifications in its May 1999 Form 10-Q because they were unusual and infrequently occurring transactions. (*Id.* at ¶ 4.)

On June 8, 1999, defendant signed a Form S-8 registration statement on behalf of Master Graphics, which was filed on June 9, 1999.[3] (*Id.* at ¶¶ 10-11.)   The Form S-8 incorporated by reference the financial statements filed with Master Graphics' May 1999 Form 10-Q. (*Id.* at ¶ 12.)   On June 23, 1999, Master Graphics' share price closed at $5.00, with a trading volume of 19,300 shares. (*Id.* at ¶ 28.)   On June 24, 1999, Morgan Keegan downgraded Master Graphics from an "outperform" to "market perform" and lowered the company's second

---

[3]   A Form S-8 is made under the Securities Act of 1933.   It is generally a form to register the offer and sale of securities to the issuer's employees as a form of compensation or incentive.   Because Form S-8 securities are offered for compensation and employees are generally familiar with the employer-issuer's business via the employment relationship, securities registered pursuant to a Form S-8 only require abbreviated disclosures that would not be adequate in a capital-raising transaction. (SEC, Final Rule, "Registration of Securities   on   Form   S-8"   available   at http://www.sec.gov/rules/final/33-7646.txt, last accessed July 25, 2006.)

AO 72A
(Rev.8/82)

quarter earnings estimate. (*Id.* at ¶ 25.)  On June 25, 1999, Master Graphics issued a press release announcing that it would not meet its second quarter earnings targets. (*Id.* at ¶ 26.)  On June 28, 1999, Morgan Keegan again reduced Master Graphics' earnings target for the second quarter of 1999. (*Id.* at ¶ 27.)  That same day, Master Graphics' share price closed at $3.94, with a trading volume of 113,800 shares--a closing price 21% below the June 23rd closing price of $5.00. (*Id.* at ¶¶ 29-30.)

On August 16, 1999, Master Graphics filed its Form 10-Q for the period ending June 30, 1999. (*Id.* at ¶ 14.)  Again, though defendant reserves the right to challenge plaintiff's exact figures, plaintiff's expert concluded that the reclassification of first quarter salary and rent expenses caused the company to understate its six-month pretax net loss in its August 1999 Form 10-Q by $896,000, or 42%. (*Id.* at ¶ 15.)  On November 15, 1999, Master Graphics filed its Form 10-Q for the period ending September 30, 1999. (*Id.* at ¶ 16.)  Though defendant reserves the right to challenge plaintiff's exact figures, plaintiff's expert concluded that the reclassification of first quarter salary and rent expenses caused the company to understate its nine-month pretax net loss in its November 1999 Form 10-Q by $896,000, or 14%. (*Id.* at ¶ 17.)

On February 18, 2000, Master Graphics issued a press release in which it first identified an issue with the accounting surrounding

8

AO 72A
(Rev.8/82)

SRIP.   The Dow Jones News Service reported the following on February 19, 2000:

> Master Graphics, Inc.  (MAGR)  said  it  discovered  a 'potentially inappropriate deferral of certain compensation and rent expenses' paid in the first quarter of 1999 totaling about $1 million.   In a press release Friday [February 18], Master Graphics said the discovery will delay until March the public release of its results of operations for the year ended Dec. 31.   The printing services company said the deferral could impact its unaudited financial statements for the periods ending March 31, 1999, June 30, 1999, and Sept. 30, 1999, and may result in the restatement of those periods . . .

(Def. SUMF at ¶ 13; Pl.'s Resp. SUMF at ¶ 2.)  Master Graphics' stock closed at $0.75 a share on February 18, 2000 and $0.81 a share on February 22, 2000--the first trading day after the accounting issues were disclosed. (*Id* at ¶ 14.)  On February 23, 2000, Master Graphics' stock closed at $0.75 a share. (*Id.* at ¶ 15.)

On April 13, 2000, Master Graphics issued another press release, again disclosing the issues associated with SRIP. (*Id.* at ¶ 16.)  In relevant part, the April 2000 release provided:

> In addition to announcing its fourth quarter and full year results, [Master Graphics] said it would restate previously released quarterly financial statements.  The Company's decision followed the determination that the deferral of certain compensation and rent expenses of approximately $0.9 million ($0.5 million net of taxes) in the first quarter was inappropriate.

(*Id.* at ¶ 17.)  In addition to the SRIP issues, the April 2000 press release disclosed additional negative developments in the company:

> [Master Graphics] also determined that depreciation expense

9

and loss on sale of assets associated with its 1999 press replacement program was understated for the first three quarters of 1999. The aggregate impact of these restatements was to decrease net income by $0.7 million for the three months ended March 31, 1999, to increase net loss by $0.5 million and $1.2 million for the three months and six months ended June 30, 1999, and to increase net loss by $1.4 million and $2.6 million for the three months and nine months ended September 30, 1999, respectively.

(*Id.* at ¶ 19.) In the same press release, Master Graphics also announced that it had experienced a $96 million net loss for the previous quarter and a $105.2 million net loss for the year. Master Graphics informed the public that its direct margin on sales for the fourth quarter had declined due to continuing competitive pressures and an increase in lower margin work. Finally, in its April 2000 press release, Master Graphics stated that it continued to experience "costs and problems associated with the installation and start up of its new printing presses" which "resulted in significant waste and shrinkage at several locations." (*Id.* at ¶¶ 20-21.)

During the same time period, the Independent Auditors Report filed with Master Graphics' Form 10-K[4] on April 13, 2000, expressed "substantial doubt about the company's ability to continue as a going concern," given that Master Graphics, "suffered losses from

---

[4] A Form 10-K is a financial form that includes a company's audited financial statements. It provides a comprehensive overview of a company's business and financial condition. A publicly traded company is required to file a 10-K at the end of its fiscal year. ("Form 10-K" available at http://www.sec.gov/answers/form10k.htm, last accessed July 25, 2006).

AO 72A
(Rev.8/82)

operations, is in violation of its debt covenants and has been unable to obtain waivers for debt covenant violations." (*Id.* at ¶ 22.) Further, in note 19 of the consolidated financial statements attached to Master Graphics' Form 10-K, the company disclosed that, during 1999, it experienced "significant declines in sales, operating income and operating cash flows." (*Id.* at ¶ 23.)  In the same note, Master Graphics also disclosed that the company's projected cash flows for future years would not be adequate to cover interest expense related to current debt levels. (*Id.* at ¶ 24.)  Finally, note 19 indicated that the company's senior lender had issued a notice of default and warned that the company's senior notes may be called. (*Id.* at ¶ 25.)

## B.   Defendant Miller's Brokerage Account

In August of 1998, defendant held 4,010,000 shares of Master Graphics in a brokerage account at Prudential Securities. (Additional Facts at ¶ 18.)  That same month, in a margin loan from Prudential, defendant borrowed more than $6 million against the shares of Master Graphics held in his account. (*Id.* at ¶ 19.)  Almost a year later, at the close of trading on June 23, 1999, the market value of the Master Graphics' shares held in defendant's account was $20,050,000. (*Id.* at ¶ 31.)  But, by the close of trading on June 28, 1999, the value of those same shares had dropped to $15,799,400. (*Id.* at ¶ 32.)

As a consequence of the drop in market value of Master Graphics' shares, on July 2, 1999, defendant transferred $623,000 of his own

11

funds to Prudential in order to maintain that firm's minimum equity requirement in his margin account. (*Id.* at ¶ 33.)   Between July 15, 1999 and July 21, 1999, defendant transferred an additional $204,000 of his own funds to Prudential, again, in order to maintain that firm's minimum equity requirement in his margin account. (*Id.* at ¶ 34.)   From November through December of 1999, Prudential liquidated all of defendant's Master Graphics' shares in order to satisfy defendant's debts with Prudential. (*Id.* at ¶ 37.)   After all of defendant Master Graphics' shares were liquidated, defendant still owed Prudential $393,000. (*Id.* at ¶ 38.)   Prudential forgave this debt. (*Id.* at ¶ 39.)   In January 2000, defendant resigned from all of his positions at Master Graphics. (Compl. [1] ("Compl.") at 3.)

Though defendant does not appear to concede that the following facts are undisputed, plaintiff contends that defendant created and implemented SRIP in order to cause Master Graphics to be able to report earnings per share that met security analysts' expectation for the first quarter of 1999. (Compl. at ¶ 30.)   Plaintiff further contends that defendant devised this plan to falsely support the price of Master Graphics' shares in order to avoid a margin call on his own Master Graphics' shares.[5] (*Id.* at ¶ 30.)   According to

_____

[5] According to plaintiff, the margin agreement between defendant and Prudential provided that, if the price of Master Graphics' shares dropped below a certain level, the brokerage firm could call in the loan. (Compl. at ¶ 29.)

12

plaintiff, if defendant had "not directed Master Graphics to overstate earnings fraudulently, thereby inflating artificially the market price for the Company's stock, he would have had to liquidate his stock at lower prices." (*Id.* at ¶ 32.)   In short, plaintiff contends that defendant is liable for directing the reclassification of certain rents and salaries; signing the June 1999 Form S-8 registration statement that incorporated by reference the financial statements which reported the fraudulently inflated net income for the first quarter of 1999; and receiving a salary from Master Graphics which, in part, compensated defendant for the fraudulent scheme to inflate Master Graphics' earnings. (*Id.* at ¶¶ 17, 25, 33.)

### C.   Claims Made by Plaintiff SEC against Defendant Miller

Based on the above, plaintiff alleges five grounds for relief in its Complaint.   In Count I, fraud, plaintiff alleges that defendant committed fraud in connection with the offer or sale of Master Graphics' securities in violation of 15 U.S.C. § 77q(a), Section 17(a) of the Securities Act. (*Id.* at 10.)   In Count II, fraud, plaintiff alleges that defendant committed fraud in connection with the purchase or sale of Master Graphics' securities in violation of 15 U.S.C. § 78j(b), Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. (*Id.* at 11.)   In Count III, internal accounting controls, plaintiff alleges that by failing to implement a system of internal accounting controls or knowingly falsifying an accounting book,

13

record, or account, defendant violated 15 U.S.C. § 78m(b)(2)(A), Section 13(b)(2)(A) of the Exchange Act and Rule 13b2-1 thereunder. (*Id.* at 12-13.)   In Count IV, aiding and abetting reporting provisions, plaintiff alleges that defendant aided and abetted violations of Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-13 thereunder. (*Id.* at 13.)   In Count V, aiding and abetting books and records provisions, plaintiff alleges that defendant aided and abetted violations of Section 13(b)(2)(A) of the Exchange Act, "which occurred when Master Graphics, as an issuer of securities, failed to make and keep accounting books, records and accounts which accurately and fairly reflected its transactions and the dispositions of its assets." (*Id.* at 14.)

In its prayer for relief, plaintiff asks the Court to issue a permanent injunction enjoining defendant (his agents, servants, employees, attorneys, and all persons in active concert or participation with them) from violating: Section 17(a) of the Securities Act; Section 10(b) of the Exchange Act and Rule 10b-5 thereunder; and Section 13(b)(5) of the Exchange Act and Rule 13b2-1 thereunder. (*Id.* at 15-16.)   Plaintiff also asks for a permanent injunction enjoining the above from aiding and abetting violations of Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-13 thereunder, and Section 13(b)(2)(A) of the Exchange Act. (*Id.* at 16.) Further, plaintiff asks the Court to issue an Order: prohibiting

defendant from acting as an officer or director of any issuer that has a class of securities registered with the Commission; requiring defendant to disgorge any ill-gotten gains together with prejudgment interest; and requiring defendant to pay civil monetary penalties. Finally, plaintiff asks the Court to retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that may be entered, as well as to entertain any suitable application or motion by plaintiff for additional relief. (*Id.* at 17.)   Plaintiff also requests that the Court grant such other and further relief as may be necessary and appropriate. (*Id.*)

## DISCUSSION

### I.   Defendant's Motion for Partial Summary Judgment

Defendant asks the Court to grant him summary judgment on just two of the above grounds for relief. First, defendant asks the Court to hold that plaintiff is time-barred from seeking civil monetary penalties from defendant. (Def. John P. Miller's Mot. for Partial Summ. J. and Mem. of Law in Supp. Thereof ("Mot. Summ. J.") [25] at 1-2.)   Second, defendant asks the Court to hold that there are no ill-gotten gains to be disgorged. (*Id.* at 2.)   The Court will address each issue in turn.

### A.   Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file,

15

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c)).

Summary judgment is not properly viewed as a device that the trial court may, in its discretion, implement in lieu of a trial on the merits. Instead, Rule 56 of the Federal Rules of Civil Procedure *mandates* the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of *every* element essential to that party's case on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In such a situation, there can be no genuine issue as to any material fact, as a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Id.* at 322-23.

The movant bears the initial responsibility of asserting the basis for his motion. *Id.* at 323; *Apcoa, Inc. v. Fidelity Nat'l Bank*, 906 F.2d 610, 611 (11th Cir. 1990). The movant is not required to negate his opponent's claim, however. The movant may discharge his burden by merely "'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. After the movant has carried his burden, the nonmoving party is then required to "go

16

beyond the pleadings" and present competent evidence[6] designating "'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting FED. R. CIV. P. 56(e)).  While the court is to view all evidence and factual inferences in a light most favorable to the nonmoving party, *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1236 (11th Cir. 2003), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

A fact is material when it is identified as such by the controlling substantive law.  *Id.* at 248.  An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant.  *Id.* at 249-50.  The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (citations omitted).  An issue is not genuine if it is unsupported by evidence, or if it is

---

[6]   The nonmoving party may meet its burden through affidavit and deposition testimony, answers to interrogatories, and the like. *Celotex*, 477 U.S. at 324.

17

created by evidence that is "merely colorable" or is "not significantly probative." *Anderson,* 477 U.S. at 249-50. Thus, to survive a motion for summary judgment, the nonmoving party must come forward with specific evidence of *every* element material to that party's case so as to create a genuine issue for trial.

**B.    Statute of Limitations**

    **1.    Application of the Catch-All, Five-Year Statute of Limitations**

Traditionally, "an action on behalf of the United States in its governmental capacity . . . is subject to no time limitation, in the absence of congressional enactment clearly imposing it." *E.I. DuPont De Nemours & Co. v. Davis*, 264 U.S. 456, 462 (1924). In this case, however, defendant, explicitly, and plaintiff, implicitly, contend that the catch-all, five-year statute of limitations set out in 28 U.S.C. § 2462 applies to plaintiff's claim for civil penalties brought pursuant to 15 U.S.C. § 77t(d)(1) (2006) and 15 U.S.C. § 78u(d)(3) (2006).[7] (*See* Mot. Summ. J. at 10; Pl.'s Opp'n to Def.'s Mot. for Partial Summ. J. ("Opp'n Summ. J.") [28] at 15.) The catch-

---

[7]    Both provisions provide, "[w]henever it shall appear to the Commission that any person has violated any provision of this subchapter, the rules or regulations thereunder . . . the Commission may bring an action in a United States district court to seek, and the court shall have jurisdiction to impose, upon a proper showing, a civil penalty to be paid by the person who committed such violation." 15 U.S.C. § 77t(d)(1) (2006); 15 U.S.C. § 78u(d)(3) (2006).

all, five-year statute of limitations provision of § 2462 provides that "[e]xcept as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any underline civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued . . ." 28 U.S.C. § 2462 (2006)(emphasis added).

Indeed, plaintiff does not argue that some other statute of limitations should apply.  Moreover, in other cases not before this Court, the SEC appears to have conceded that a claim by the SEC for a civil penalty is covered by the catch-all statute and should be limited to five years.[8] *See, e.g., SEC v. McCaskey*, 56 F. Supp. 2d 323, 326 (S.D.N.Y. 1999); *SEC v. Buntrock*, No. 02 C 2180, 2004 WL 1179423, at *11 (N.D. Ill. May 25, 2004); *SEC v. Ogle*, No. 99 C 609, 2000 WL 45260, at *4 (N.D. Ill. Jan. 11, 2000).  In sum, as plaintiff has not objected to its application, the Court will accept the defendant's contention that the catch-all, five-year statute of limitations found in 28 U.S.C. § 2462 applies to plaintiff's claim to recover civil penalties from defendant.[9]  The Court will thus proceed

_____

[8]  SEC civil enforcement actions seeking equitable relief (i.e., disgorgement) are not subject to any limitations period. *SEC v. Calvo*, 378 F.3d 1211, 1218 (11th Cir. 2004); *see also SEC v. Lorin*, 869 F. Supp. 1117 (S.D.N.Y. 1994).

[9]  In doing so, however, the Court notes that the Eleventh Circuit has issued two cases that arguably suggest that no statute of limitations applies to a claim for civil penalties brought by the SEC

19

to address plaintiff and defendant's dispute over when the five-year statute of limitations began to accrue.

### 2. When did the five-year statute of limitations begin to accrue?

In moving for summary judgment on this issue, defendant argues that the SEC's request for civil penalties is time-barred. (Mot. Summ. J. at 9.) Defendant maintains that, even in viewing all

---

under 15 U.S.C. § 77t(d). In *SEC v. Calvo*, a case where civil penalties were assessed, recognizing that defendant's statute of limitations defense would have precluded the SEC's entire action, the Eleventh Circuit followed the Ninth Circuit and declared, "[i]n suing to enforce the securities laws, the SEC is vindicating public rights and furthering public interests . . . there is no indication that Congress intended for a statute of limitations to apply to this enforcement action." 378 F. 3d 1211, 1218 (11th Cir. 2004). Though the passage just quoted was directed specifically to the question of statute of limitations as applied to an SEC action for disgorgement, the Eleventh Circuit did not note or carve out any exception for a statute of limitations to be applied to the civil penalties assessed in the case.

Further, in *SEC v. Diversified Corp. Consulting Group*, a case issued the same day as *Calvo*, the Eleventh Circuit's language providing that no statute of limitations applies to a claim for disgorgement brought by the SEC seemed to apply more broadly to all SEC enforcement actions brought under 15 U.S.C. § 77t. In the words of the *Diversified* court, "[t]he SEC's authority to bring an action against the seller of unregistered securities, however, is conferred by 15 U.S.C. § 77t . . . When the SEC sues to enforce the securities laws, it is vindicating public rights and furthering public interests, and therefore is acting in the United States's sovereign capacity . . . Because in bringing this action the SEC was acting in the sovereign capacity of the United States in enforcing its securities laws, no statute of limitations applies." 378 F.3d 1219, 1224 (11th Cir. 2004). Again, as in *Calvo*, this circuit did not note or carve out any exception for the application of a statute of limitations to an SEC action seeking to recover civil penalties under 15 U.S.C. § 77t(d).

AO 72A
(Rev.8/82)

evidence in the light most favorable to plaintiff, plaintiff's claim for civil penalties accrued prior to June 8, 1999.[10] (*Id.*) Specifically, defendant argues that the latest date on which the plaintiff should have discovered the facts forming the basis of its cause of action was May of 1999 upon the filing of Master Graphics' May 1999 Form 10-Q. (*Id.* at 12.) In response, plaintiff insists that it did not have sufficient notice of the securities fraud implemented by defendant until after June 8, 1999. (Opp'n Summ. J. at 17.) Plaintiff maintains that it is for the finder of fact to determine when this cause of action to recover civil penalties for federal securities fraud accrued. Plaintiff argues that reasonable minds could disagree as to whether plaintiff had sufficient notice of the fraud by May 17, 1999. (*Id.*)

In this circuit, for an action to vindicate private rights, it is well-established that the statute of limitations for a securities fraud claim begins to accrue after "discovery of the facts constituting the violation." *See Theoharous v. Fong*, 256 F.3d 1219, 1228 (11th Cir. 2001)(quoting *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 364 (1991)).[11] "Discovery

---

[10]   As the Complaint in this action was filed on June 8, 2004, application of a five-year statute of limitations means that only those causes of action accruing after June 8, 1999, are timely.

[11]   The cases cited by both parties for the "discovery rule" concern actions brought pursuant to Section 10(b) of the Exchange Act

occurs when a potential plaintiff has inquiry or actual notice of a violation." *Id.* (internal citation and quotation omitted). "Accrual does not depend upon knowledge that a particular cause of action may be available and does not require discovery of each and every fact which forms the basis for the cause of action. Rather, the two-year period begins to run once a plaintiff has actual or constructive knowledge of only 'the facts forming the *basis* of his cause of action' and not that of the cause of action itself." *Becks v. Emery-Richardson, Inc.*, No. 86-6866-CIVGONZALEZ, 1990 WL 303548, at *9 (S.D. Fla. Dec. 21, 1980)(quoting *Vigman v. Cmty. Nat'l Bank & Trust Co.*, 635 F.2d 455, 459 (5th Cir. 1981)). "Inquiry notice is triggered by evidence of the *possibility* of fraud, not full exposition of the scam itself." *Theoharous*, 256 F.3d at 1228 (emphasis added).

    Stated differently, a cause of action under Section 10(b) of the

---

or Section 17(a) of the Securities Act. Neither party has cited any cases on accrual for actions brought pursuant to Section 13 of the Exchange Act. However, both parties contend that the "discovery rule" should apply equally to claims for fraud brought by the Government, regardless of what section of the Securities Act or Exchange Act those claims may be brought under. Defendant cites a case from the United States District Court for the District of Puerto Rico for the proposition that, broadly, "for federal causes of action under the 1933 and 1934 Acts, the [] limitation period begins to run on the date that the illegal action is or should have been discovered." *Salgado v. Piedmont Capital Corp.*, 534 F. Supp. 938, 947 (D. P.R. 1981). In the end, the Court concludes that the "discovery rule" should apply to actions brought pursuant to Section 13 of the Exchange Act.

Exchange Act or Section 17(a) of the Securities Act, "'accrues when the aggrieved party has either actual knowledge of the violation or notice of facts which, in the exercise of due diligence, would have led to actual knowledge thereof.'" *Summer v. Land & Leisure, Inc.*, 664 F.2d 965, 968 (5th Cir. 1981). Importantly, "[t]he concept of due diligence is not imprisoned within the frame of a rigid standard; it is protean in application.   A fraud which is flagrant and widely publicized may require the defrauded party to make immediate inquiry. On the other hand, one artfully concealed or convincingly practiced upon its victim may justify much greater inactivity." *Id.* at 970. "Circumstances that create a duty of inquiry frequently are referred to as 'storm warnings.'" *Tello v. Dean Witter Reynolds, Inc.*, 410 F.3d 1275, 1283 (11th Cir. 2005).    Indeed, a "suspicious circumstance" must exist before there is a duty to inquire. *Id.* at 1284.   The standard to be applied in determining when a plaintiff was put on inquiry notice is that of an objective, reasonable person. *Franze v. Equitable Assurance*, 296 F.3d 1250, 1254 (11th Cir. 2002).

Without discussion or analysis of the matter, or citation to any case that would support the proposition, defendant implicitly asks the Court to apply this "discovery rule," applicable to a private parties' securities fraud action, to the public rights action brought here by the SEC. (Mot. Summ. J. at 11-12.)   In response, while it acknowledges that the outcome of applying § 2462's five-year statute

of limitations will depend on whether the Court adopts the "discovery rule," plaintiff does not argue for the application of any alternative rule. (Opp'n Summ. J. at 15-16.)   In the end, plaintiff cites the only case on-point for this issue.

In *SEC v. Buntrock*, a recent unpublished decision from the United States District Court for the Northern District of Illinois, the court considered whether the "discovery rule" applies to an SEC action for civil monetary penalties pursuant to Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act where the catch-all five-year statute of limitations of 28 U.S.C. § 2462 was also being applied. No. 02 C 2180, 2004 WL 1179423, at *11 (N.D. Ill. May 25, 2004).  Considering the same statutes at issue in the present action, the *Buntrock* court indicated its research had uncovered no decision that directly addressed the question, and then went on to conclude that the "discovery rule" (referred to by the *Buntrock* court as the "discovery of violation" rule) should be extended to claims for civil penalties in securities fraud actions governed by the five-year statute of limitations in Section 2462 and brought by the SEC. *Id.* at *12. Ultimately, the *Buntrock* court held that, "the five-year statute of limitations for civil penalties does not accrue when the fraud occurs, bur rather when the plaintiff learns, or should have learned through the exercise of ordinary diligence in the protection of one's legal rights, enough facts to enable him, by such further

24

investigation as the facts would induce in a reasonable person, to sue within five years." *Id.* (internal citation and quotation omitted).

Though its decision is in no way binding, the plaintiff concedes this approach and the Court will therefore follow the lead of *Buntrock* and apply the "discovery rule" delineated above, a rule oft applied in this circuit to private rights securities fraud actions, to plaintiff's claim for civil penalties.

Defendant contends that, at least by May 17, 1999, when Master Graphics' Form 10-Q was filed, plaintiff had "notice of facts which, in the exercise of due diligence, would have led to" knowledge of the fraud at issue. (*See* Mot. Summ. J. at 12.)  More specifically, defendant contends that analysis of the May 1999 Form 10-Q "in isolation and in comparison with" earlier Master Graphics' filings such as the 1998 10-K should have prompted plaintiff to undertake further investigation which should have revealed the basic facts upon which plaintiff could have brought its claim for civil penalties. (*Id.* at 14.)  Defendant cites numerous internal communications, and a general knowledge of SRIP among Master Graphics' management in support of his assertion that, if plaintiff had inquired further, plaintiff would have discovered the fraudulent reclassification of certain salaries and rents. (*Id.* at 14-16.)

Defendant concedes that SRIP was not overtly discussed in

25

Master Graphics' May 1999 Form 10-Q. (Resp. to Deem at 5.)   Instead,
defendant maintains that key indicators within the May 1999 Form 10-Q
constituted the kind of "storm warnings" that should have triggered
plaintiff's duty to investigate further. (*Id.* at 6.)   Defendant's
first example of a "storm warning" is the "unusual and large increase
in the number of Days Sales Outstanding," shown in the May 1999 Form
10-Q. (*Id.*)   Citing several Practicing Law Institute articles on
detecting financial fraud from 2000, 2002, 2004, and 2005, defendant
maintains that the significant increase in Master Graphics' Days
Sales Outstanding from the fourth quarter of 1998 to the first
quarter of 1999 was a "storm warning" indicating that something could
be amiss with the Company's accounts receivable. (*Id.* at 7.)
Defendant's second and only other example of a "storm warning" is the
40 basis points decline, to 17.6% of sales, in Master Graphics' first
quarter 1999 salary, general, and administrative expenses ("SG&A").
(*Id.*)   In summary, defendant's position is that "had the SEC acted on
the indicators mentioned above by following up in the slightest way,
it would have readily obtained the information it needed to learn of
the Salary and Rent Incentive Plan before June of 1999." (*Id.* at 8.)

    In certain situations, a court may decide, as a matter of law,
when a federal securities fraud action accrued.   For example, in
*Theoharous*, the Eleventh Circuit upheld this Court's conclusion that
a defendant's public announcement that it was filing for bankruptcy,

AO 72A
(Rev.8/82)

coupled with an announcement that it had been experiencing substantial cashflow deficiencies and financial difficulties including a temporary shutdown of its manufacturing facilities, was sufficient, as a matter of law, to put the plaintiff on inquiry notice of the possibility of fraud. *Theoharous,* 256 F.3d at 1228. Along similar lines, other district courts in this circuit have held that an SEC order suspending trading of a stock is sufficient as a matter of law to put any potential plaintiffs on inquiry notice of the possibility of fraud. *Ubuy Holdings, Inc. v. Gladstone,* 340 F. Supp. 2d 1343, 1348 (S.D. Fla. 2004). Also, in the case of *In re Mirant Corp. Sec. Litigation,* No. Civ.A. 1:02-CV-1467, 2003 WL 24027927 at * 14 (N.D. Ga. July 16, 2003)(Martin, J.), Judge Martin held that a group of potential plaintiffs was on inquiry notice that the energy corporation, Mirant, may have fraudulently overcharged California energy markets by virtue of publicly known investigations, administrative actions, lawsuits, and company disclosures explicitly disclosing that the company was being investigated for its role in the wholesale energy prices charged in California during the summer of 2000. Simply put, "public announcements and statements in prospectuses distributed to investors can be sufficient, as a matter of law, to put a potential plaintiff on inquiry notice of a claim." *Id.* at *5.

Importantly, however, "[w]hen considering due diligence on a

motion for summary judgment, the court must recognize that the issue is often a question of fact . . . Thus, summary judgment is appropriate only where no reasonable jury could differ as to whether the plaintiffs exercised due diligence in discovering the fraud." *Durham v. Business Mgmt. Assocs.*, 847 F.2d 1505, 1509-10 (11th Cir. 1988). Indeed, the Eleventh Circuit has recognized on multiple occasions that "questions of notice and due diligence are particularly suited for a jury's consideration." *Tello*, 410 F.3d at 1284; *Kennedy v. Tallant*, 710 F.2d 711, 716 (11th Cir. 1983).

The articles cited by defendant on fraud and Days Sales Outstanding do indicate that a substantial increase or lengthening of Days Sales Outstanding "should be explored further." However, these same articles also state that this change could be a warning of something far more innocuous than financial statement fraud. (Resp. to Deem at Ex. 6.) Moreover, none of the articles cited by defendant were published at the time Master Graphics issued its May 1999 Form 10-Q. The oldest article cited by defendant was published in September 2000, more than a year after Master Graphics filed its first quarter 1999 10-Q. Consequently, the Court has no way of knowing whether a change in Days Sales Outstanding has always been recognized as a sign of fraud or has only been so recognized more recently.

Even if a substantial change in Days Sales Outstanding has

AO 72A
(Rev.8/82)

always been a warning sign that something may be amiss, on the facts presented here, the Court cannot say as a matter of law that at least by May 17, 1999, when Master Graphics' Form 10-Q was filed, plaintiff had "notice of facts which, in the exercise of due diligence, would have led to" knowledge of the fraud at issue thereby causing the statute of limitations for plaintiff's claim for monetary penalties to accrue.  While the finder of fact may conclude that the May 1999 Form 10-Q put plaintiff on inquiry notice of fraud, that same finder of fact could likewise conclude the opposite.  A change in a financial statement figure that can only be recognized by comparison to a filing made in a previous quarter is something much different than a public announcement that a company will be filing bankruptcy or is under investigation.  Accordingly, while the Court could say as a matter of law that plaintiff was on inquiry notice of defendant's fraud by February 18th or 19th of 2000, when Master Graphics' press release explicitly identifying an issue with the accounting surrounding SRIP was reported by the Dow Jones News Service, the Court cannot say as a matter of law that plaintiff was on inquiry notice of defendant's fraud as early as May 17, 1999.  The Court therefore **DENIES** Defendant John P. Miller's Motion for Summary Judgment [25] on the ground that plaintiff's claim for civil monetary penalties is time-barred.  Because the Court has determined there is a question of fact as to whether plaintiff was on inquiry notice of

29

defendant's fraud as early as May 17, 1999 and because plaintiff has not separately moved for summary judgment on this or any other issue, the Court will not consider plaintiff's alternative grounds for finding that its claim for civil monetary penalties is time-barred. Namely, that plaintiff's claim for three filings made after June 8, 1999, which incorporate the May 1999 figures, are nonetheless timely. (*See* Opp'n Summ. J. at 18.)

### C.   Disgorgement

In addition to requesting that this Court bar imposition of any civil penalties, on statute of limitations grounds, defendant asks the Court to hold that there are no ill-gotten gains to be disgorged and therefore to grant defendant summary judgment as to this claim for relief.   In support of his motion, defendant asserts that the disgorgement figures proposed by plaintiff are unreasonable on their face.   (Mot. Summ. J. at 21.)   Relying on his expert's report, defendant argues further that plaintiff's disgorgement figures are not reasonable because plaintiff based its disgorgement calculations on the wrong date. (*Id.*)  Defendant argues that it is not reasonable for plaintiff to base its disgorgement figures off the decline in Master Graphics' share price that occurred after Master Graphics' April 13, 2000, press release because, in addition to SRIP, the April 2000 press release disclosed a myriad of other negative issues about Master Graphics, all of which played into the April 2000 change in

AO 72A
(Rev.8/82)

Master Graphics' share price. (*Id.* at 22.)   In response, plaintiff maintains that each of its various theories of disgorgement are reasonable. (Opp'n Summ. J. at 22-25.)   Plaintiff further maintains that, in order to evaluate disgorgement, the Court should consider how SRIP impacted Master Graphics' share price and defendant's related margin obligations in May 1999, when the company first misrepresented that it had met analysts' first quarter estimates. (*Id.* at 23.)

"The SEC is entitled to disgorgement upon producing a reasonable approximation of a defendant's ill-gotten gains." *SEC v. Calvo*, 378 F.3d 1211, 1217 (11th Cir. 2004).   The disgorged amount must be causally connected to the violation.   *Id.* Once the SEC meets its burden of producing a reasonable approximation of defendant's ill-gotten gains, "[t]he burden then shifts to the defendant to demonstrate that the SEC's estimate is not a reasonable approximation." *Id.*   In determining whether the SEC has met its burden, "[e]xactitude is not a requirement; '[s]o long as the measure of disgorgement is reasonable, any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty.'" *Id.*

The plaintiff advances six theories, and six different calculations, in support of its claim for disgorgement.   The defendant contends that plaintiff has failed to show a causal connection or reasonable approximation of the amount of defendant's

31

ill-gotten gains.   In support of this contention, defendant has provided an expert report and persuasive arguments that challenge the logic of plaintiff's position.   In support of its own position, the plaintiff offers argument that covers only two and one-half pages and that consists of little more than conclusory statements to the effect that the defendant has received gains that he should disgorge.   In candor, the arguments advanced by plaintiff are so spare and provide so little explanation of the plaintiff's reasoning and methodology that this Court finds it difficult to even evaluate them.   It may well be that the defendant has sustained some gains that should be disgorged, but the Court cannot articulate why that is so, based on a reading of the plaintiff's response. As the defendant notes, it is up to the plaintiff to explain and support its position; it is not the defendant's or the Court's duty to intuit what that position might be.   For that reason, the Court grants summary judgment to defendant on the disgorgement claim, as to all theories, save one: the interest theory.

### 1.    Theory One: $4,250,600

As set out in its Response to the defendant's motion for summary judgment, plaintiff's first theory of recovery is based on the presumed decline in value of the shares of the company attributable to concealed accounting manipulation by the defendant.   That is, if the Court is understanding the plaintiff's argument, the shares of

32

the company were artificially inflated by the company's false statement that it had met first quarter projections.  As defendant held shares in the company, the defendant's holdings were also improperly inflated by this non-disclosure.

To arrive at a calculation of plaintiff's improper gains during the period of time when the public incorrectly believed that the company had met its earnings projection for the first quarter, the plaintiff uses, as a proxy, the amount that the shares dropped later, when the Master Graphics accurately revealed  that it had not made its second quarter earnings projection.  Specifically, from June 23, 1999 to June 28, 1999, when Master Graphics disclosed that it would not meet second quarter earnings estimates, the company's share price dropped 21%.  Plaintiff argues that this percentage decline should be applied to the value of shares in Master Graphics held by the defendant.

Thus, between June 23-28, 1999, the defendant held $20,050,000 in shares and the value of those shares decreased by 21%, or by $4,250,600, dropping the value of the shares held by defendant to $15,799.400.  Although the defendant actually <u>lost</u> over four million dollars, plaintiff argues that this loss was really a gain of the same amount of money.  Specifically, the plaintiff wants the defendant to "disgorge" this $4,250,600 "gain," arguing that the defendant would have lost this four plus million dollars earlier, at

33

the time the Company falsely reported it had made it first quarter projections, had the Company accurately reported that it had not made its projections, save by accounting manipulations.

Candidly, the Court does not understand this argument at all. The defendant lost $4,250,600 in June; he did not make any money. Had he lost this four million dollars after the first quarter, he would not have lost the same money in June: the money would have already been lost earlier. It would appear to be a wash. Now, had the defendant sold shares between the time that the first quarter earnings were falsely reported and some later time, the profits on those sales would have arguably been inflated, resulting in an improper gain for the defendant. Yet, nowhere in its response does the plaintiff say that the latter event occurred, nor quantify any such profits. In short, the Government does not understand the plaintiff's position on this theory and it **GRANTS** summary judgment to the defendant on this ground.[12]

---

[12]   The defendant also argues that it is unreasonable to assume that the decline in shares prompted by Master Graphics' announcement that it would not meet second quarter earnings estimates would be the same decline had Master Graphics earlier announced that it would not meet first quarter projections. The defendant notes that the disclosure prompting this June decline was Morgan Keegan's announcement that internal growth had slowed; this announcement nowhere mentioned anything about a failure to meet earning estimates.

AO 72A
(Rev.8/82)

### 2.     Theory Two: $827,000

The second theory advanced by the plaintiff in its response is that the Court should order defendant to disgorge $827,000: the amount that defendant paid to Prudential in July of 1999 to satisfy his margin obligations. (*Id.* at 24.)   The reasoning underlying this theory is that, had defendant not implemented SRIP, and thereby manipulated earnings, Master Graphics' share price would have dropped immediately after the announcement of first quarter earnings, thus forcing defendant to make the $827,000 payment to Prudential two months earlier, in May of 1999, instead of in July of 1999.

Again, the Court does not understand the logic of this argument. The defendant was only going to have to make this payment once.  Had he paid this $827,000 in May, he would not have  had to make the same payment in July.   The Court can discern no gain here, with the possible exception of plaintiff's fall-back argument (Theory Three) that the defendant did benefit from having the use of this $827,000 for two extra months.   The Court addresses this third theory, next. Accordingly, the Court **GRANTS** summary judgment to defendant on this second theory of plaintiff's.

### 3.     Theory Three: $10,184

As noted, plaintiff's third theory is related to plaintiff's second theory.  Theory Three is that the Court should order defendant to disgorge the approximate interest that he could have received on

AO 72A
(Rev.8/82)

the $827,000 that he later paid Prudential, from May 17, 1999, when the payment might have come due, but for the accounting manipulation, to July 2, 1999, when it was actually paid. (*Id.* at 24 n.64.)

As explained above, the Court will accept that this could be a plausible theory for gain and will **DENY** the defendant's motion for summary judgment on this theory.[13]

### 4.   Theory Four: $393,000

Plaintiff's fourth theory is that the Court should order defendant to disgorge $393,000, which represents the amount of debt that Prudential forgave after liquidating all of defendant's Master Graphics' shares. (*Id.* at 24.)  In support of this theory, plaintiff argues that if Prudential's margin calls had begun shortly after Master Graphics announced its first quarter earnings, defendant would have had $400,000 in cash with which to pay his debt to Prudential, and there would, accordingly, have been no debt left to forgive. (*Id.* at 24-25.)

Again, the Court has difficulty understanding the plaintiff's position.  Had Master Graphics indicated earlier that it had not made

---

[13]   Nonetheless, the Court notes that the amount of interest attributable to this delay is *de minimus,* in the scheme of things, and arguably not worth the litigation expense and court resources expended in litigating this theory.  Specifically, applying 7.75% as the prevailing prime rate of interest, plaintiff calculates defendant's ill-gotten gain to be $10,184 [($827,000*7.75%)*(55 days/365)].  (*Id.* at 24.)

AO 72A
(Rev.8/82)

its first quarter projections, presumably the same chain of events that later occurred would have just occurred sooner.  That is, the price of the shares would have gone down, Prudential would have made a margin call, and then would have liquidated all the defendant's shares in Master Graphic.   Perhaps, there would have been a difference in the valuation of the shares earlier, but the plaintiff does not explain how or why, and this Court cannot speculate on that prospect.  Accordingly, the Court **GRANTS** the defendant's motion for summary judgment as to this theory of disgorgement.

### 5.   **Theory Five- $327,691 and Theory Six- $710,154**

Theories One-Four were first advanced in the plaintiff's response to defendant's motion for summary judgment.  Two different theories--denominated by the Court as Theory Five and Theory Six-- were advanced earlier in the litigation by the plaintiff.  Defendant contested these two theories in his opening memorandum in support of the motion for summary judgment, and supported his position with the opinion of an expert.  As plaintiff does not appear to have responded to the defendant's challenge of these two theories, the Court deems these two theories to be abandoned by the plaintiff and it **GRANTS** the defendant summary judgment on this theory.

In short, except for the "interest" theory, which has been denominated as Theory Four, the defendant has received summary judgment on all other theories advanced by the plaintiff in support

37

of disgorgement.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS in part and DENIES in part** Defendant John P. Miller's Motion for Summary Judgment [25] AND **DENIES** Securities and Exchange Commission's Motion to Deem as Admitted Its Statement of Additional Material Facts and Supporting Memorandum of Law [49].

SO ORDERED, this 31 day of July, 2006.

JULIE E. CARNES
UNITED STATES DISTRICT JUDGE

38

AO 72A
(Rev.8/82)