IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION



FILED IN CHAMBERS
U.S.D.C. Atlanta

SEP 3 0 2010

JAMES N. HATTEN, Clerk

By: _____ Deputy Clerk

SECURITIES AND EXCHANGE
COMMISSION,

        Plaintiff,

v.

JOHN P. MILLER,

        Defendant.

CIVIL ACTION NO.

1:04-cv-01655

## ORDER and OPINION

This case is presently before the Court to determine remedies for plaintiff Securities and Exchange Commission ("SEC") after a jury found John P. Miller ("Miller" or "defendant") liable for five counts of federal securities fraud.  After review of the record and the arguments of the parties, the Court issues: (1) a permanent injunction enjoining defendant (his agents, servants, employees, attorneys, and all persons in active concert or participation with them) from violating Section 17(a) of the Securities Act of 1933 ("Securities Act"); Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder; and Section 13(b)(5) of the Exchange Act and Rule 13b2-1 thereunder; and enjoining defendant from aiding and abetting violations of Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-13 thereunder and Section

1

13(b)(2)(A) of the Exchange Act; (2) a civil penalty in the amount of $75,000; and (3) a director and officer bar of five (5) years.

## BACKGROUND

### I.   Background of Master Graphics and Miller's Margin Accounts

Miller was President, Chief Executive Officer ("CEO"), and Chairman of the Board of Master Graphics, Inc. ("Master Graphics" or "the Company"), a company formed in 1997 and located in Memphis, Tennessee.  (Tr. [168] at 68:2-5.)

Starting in June 1997, Master Graphics acquired printing companies throughout the United States that were then consolidated into divisions. (Id. at 74:3-7; 75:9-11.)  Most former owners became employed by Master Graphics as division presidents and retained ownership of the property that housed the printing companies they had owned.   Master Graphics then leased the property for the various divisions from the division presidents.   Each division's purchase price was based on financial targets the division presidents had represented they would meet, post-acquisition.   (Id. at 76:19-25; 77:8-13.)

The Company completed an initial public offering ("IPO") of 3.6 million shares of common stock in June 1998 and raised approximately $36 million.   (Id. at 75:4-5; 79:1-3, 24-25; 80:3.)  At the time of the IPO, Miller had purchased approximately eleven companies; he bought nine more by the end of 1999. (Id. at 75:20-23.)  At the time the Company went public, Lance Fair ("Fair") was the Chief Financial

2

Officer ("CFO"), and Mel Henson ("Henson") was the Chief Accounting Officer ("CAO").[1] (Tr. [168] at 92:2-5.)

Miller owned 4,010,000 shares of stock, thus maintaining a controlling interest in the Company. (*Id.* at 79:18; 83:10-12.) He kept these shares, which were worth approximately $40 million, in a margin account with Morgan Keegan & Company ("Morgan Keegan"), an investment banking firm that covered the Company. (*Id.* at 83:14-17.) In 1998, he moved the shares to a brokerage account at Prudential Securities ("Prudential") and borrowed more than $6 million against them. (*Id.* at 84:1-5.) Miller testified that he did not specifically remember telling the Board of Directors about this margin loan. (*Id.* at 87:13-25; 88:1-23.)

## II. The Plan

While the Company initially thrived, around April 1999, Miller learned that the Company's first quarter results would not meet the estimate set by Morgan Keegan, as the majority of divisions had failed to achieve the financial targets they had represented to Master Graphics. (Def.'s Mem. Advising Ct. Materials to Focus on upon Review of Trial Proceedings ("Def.'s Mem.") [179] at 2; Tr. [168] at 98:9-16.) He was worried that missing the target would trigger a margin call by Prudential, as the stock was trading around $6.00 per share, and he knew that a margin call would occur if the

---

[1] Henson became the CFO after Fair resigned in December 1999. (Tr. [168] at 92:2-10; Tr. [169] at 206:5-9.)

3

stock price dropped to \$4.25 per share.  (Pl.'s Resp. to Assist Ct. in Review of Record ("Pl.'s Resp.") [180] at 9.)  He also was concerned about how the numbers would affect a transaction with Heidelberg Equipment ("Heidelberg"), the largest manufacturer of printing equipment in the world, that he hoped would lead to a cash infusion of approximately \$12 million.[2]  (Tr. [168] at 96:12-17; 97:13-23; 98:20-24.)

Therefore, Miller devised the Salary and Rent Incentive Plan ("the Plan"), a plan to reclassify the rent and salary payments for the first quarter of 1999 as prepaid expenses or receivables that would be repaid by the division presidents unless certain performance targets were met over the subsequent quarters.  (*Id.* at 104:4-25; 107:10-20.)  Miller presented the Plan to division presidents and other personnel during a meeting in Atlanta, Georgia on April 22 and 23, 1999.  (*Id.*)

According to Miller, the response of the division presidents to this idea was positive, and no one opposed the Plan during the meeting.  (*Id.* at 107:10-20; 108:1-5.)  However, several division presidents have contradicted Miller, noting that they expressed negative reactions to the Plan, including the opposition by some to the rent aspect.  (*See, e.g.,* Tr. [169] at 314:21; Tr. [175] at 1171:1-8.)  Miller did not seek any firm commitments to the Plan from

---

[2]  This deal eventually went through in the second quarter of 1999.  (Tr. [168] at 142:8-9.)

any of the division presidents at the meeting. (*See, e.g.*, Tr. [169] at 233:2-5; 315:7-12.)

Over the next two weeks, Miller spoke by phone with the division president of each of the twenty printing companies, and he testified that everyone agreed to the Plan (Tr. [168] at 112:2-24),[3] even though no employees ever made any changes to their contracts in writing regarding payment. (*Id.* at 126:14-19.) After each purported phone call, Miller would walk down the hall and tell Fair and Henson that the particular division president with whom he had just spoken had agreed to the Plan. (*See, e.g.*, Pl.'s Resp. [180] at 4.)

Before presenting the Plan to the division presidents, Miller had previously discussed it with Fair, and he testified that he relied on Fair and Henson to get the approval of KPMG, Master Graphics' auditor, for the Plan.[4] (Tr. [168] at 104:4-9; 113:4-13; 129:16-21.) Also, after Miller allegedly got every division president's consent, Fair and Henson testified that the division presidents they contacted afterward said they had agreed to the Plan and that no division presidents ever told them that they had not agreed to the Plan. (Tr. [168] at 112:25; 113:1-3; Tr. [169] at

---

[3] Judge Baverman opined that Miller spoke to division presidents alone to give himself "plausible deniability" in case the Plan was discovered. (Tr. [154] at 93:1-6.) The Court concurs with this characterization.

[4] Both Fair and Henson ultimately agreed to settlements with the SEC consisting of a $25,000 civil penalty and a cease and desist order. (*See* Fair & Henson Settlement Docs., Ex. 1 to [179].)

5

266:11-25;  267:1-25;  268:1-25;  269:1-25;  270:1-2,  7-14;  272:8-21;

418:14-25;  419-424;  Tr. [170] at 434:14-25;  435-472;  473:1-20.)

### III. Conflicting Testimony About the Plan

While there was no e-mail documentation about any complaints,

numerous employees testified at trial that they, in fact, did not

agree to the Plan.  For example, Mike Harper ("Harper"), president

of Harperprints, testified that he refused to participate in the Plan

because his division had met its first quarter 1999 earnings target,

and he did not want to be penalized for other divisions' poor

performance; furthermore, Miller never asked Harper's wife, Harper's

co-owner, if she agreed to the Plan. (Tr. [168] at 117:25-118:9; Tr.

[170] at 529:18-25; 530:8.)  Keith Jefferies, president of the Golden

Rule Division, stated that he agreed to the Plan, but only because

he was told the Plan involved accounting entries and would not impose

any future financial obligation on him; he stated that he would not

have agreed to the Plan if he had been told that he actually might

have to repay his rent and salary.   (Tr. [171] at 711:20-712:7.)

Carey Rosenthal, president of the Phoenix Division, agreed to have

his salary reclassified, but would not agree to the rent part of the

Plan because he had to pay mortgage; Rosenthal's partner stated that

he needed to see the proposal in writing before he could evaluate it

properly.   (Tr. [170] at 631:8-24; 656:8-14.)   Likewise, Wendell

Burns, president of Jones Printing, testified that he did not agree

to the Plan because he needed the rent payments to pay the mortgage.

6

(Burns Dep. [37] at 27:21-28:5 (played in open court before the jury).)   Eli Huffman, president of the Technigrafiks Division, testified that he asked if he could repay his first quarter salary without having it reclassified as a loan because he thought the Plan sounded dishonest.  (Tr. [172] at 849:1-8; 850:10-25; 851:1.)  David Sutherland, president of the Sutherland Division, testified that he refused to agree to the Plan because he did not want to repay for what he had already done.    (Sutherland Dep. [33] at 96:16-17:6 (played in open court before the jury).)

Notwithstanding the above, Miller testified that he believed that all the division presidents had agreed to the Plan.  (Tr. [168] at  117:3-24;  Tr.  [170]  at  271:4-25;  272:1-21.)    There  was  no documentation that any division presidents ever stated that their divisional numbers were inconsistent with their division's financial performance for the first quarter of 1999.  (Tr. [169] at 252:3-9.) Miller cited at trial a May 14, 1999 electronic memorandum to each of the division presidents in which he generally discussed their commitment to the Plan and the impact of the Plan on the financial statements for the first quarter of 1999.  (Tr. [170] at 193:7-25; 194:1-20.)  None of the division presidents ever responded by e-mail to state that they did not commit to the Plan.  (Id. at 270:7-10; 272:16-21.)  After Miller sent out this memorandum, an e-mail to each of the division controllers was sent on May 17, 1999 confirming that the division presidents had agreed to the Plan, and no one disagreed

7

with the language or terms of the Plan.   (Tr. [168] at 128:3-19.)
Furthermore, no one ever told the Company's Audit Committee, KPMG,
or Robert Diehl ("Diehl"), the Chief Operating Officer ("COO") who
eventually replaced Miller as CEO in early 2000, that they had not
agreed to the Plan.   (Tr. [169] at 349:9-25; 350:1-2.)

Defendant noted the testimony of David McQuiddy ("McQuiddy"),
division  president  of  McQuiddy  Printing,  one  of  the  divisions
purchased by Master Graphics, who testified that he recalled Miller's
proposing the Plan, that he agreed to the Plan and understood how it
would work, and that his company satisfied the financial benchmarks
of  the  Plan.    (Def.'s  Mem.  [179]  at  9;  Tr.  [175]  at  1156:2-14;
1157:6-25;  1158:1-4.)    McQuiddy's  financial  statements  were  not
restated  and  were  therefore  in  accordance  with  GAAP  ("Generally
Accepted Accounting Principles").   (Tr. [176] at 1430:10-25; 1431:1-
4.)

## IV.   SEC Filings and Effect on Stock Price

Miller testified that he told the Board of Directors about the
Plan at a Board of Directors meeting on May 5, 1999.   (Tr. [168] at
123:23-25; 124:1-4.)   However, this discussion was not in the minutes
of the meeting.   (*Id.* at 125:1-9.)   Fair, who recorded the minutes,
could not say why the minutes were not recorded.   (*See generally* Tr.
[169].)   Master Graphics issued a press release announcing first
quarter earnings on May 6, 1999.   It did not, however, mention its
reclassification of rents and salaries as assets.   (Additional Facts

8

[29] at ¶ 3.)   No one from KPMG ever saw any information about the Plan while it conducted its first quarter review; Miller also did not disclose the reclassifications to the Morgan Keegan analyst, John Lawrence ("Lawrence"), who covered the Company.   (Tr. [168] at 133.)

The inflation of Master Graphics' earnings accomplished Miller's goal, as it buoyed the stock price from $5.50 on May 5, 1999, the day before the press release, to $6.0625 on May 6, 2009.   (Pl.'s Resp. to Def.'s Statement of Undisputed Facts and Pl.'s Additional Facts ("Additional Facts") [29] at ¶ 22.)   On May 10, 1999, Lawrence confirmed that the first quarter results met estimates and maintained both the "outperform" rating and the earnings target for the second quarter.   (Lawrence Dep. [28-39] at 50:24-51:6 (played in open court before the jury).)   Plaintiff's expert concluded that the reclassification of expenses caused the Form 10-Q to overstate the Company's pretax earnings by approximately $896,000, or 68%.[5] (Additional Facts [29] at ¶ 13.)   On June 8, 1999, Miller signed a

---

[5]  While the rent and salary expenses paid during the second and third quarters were reported correctly, the first quarter reclassifications created inaccurate results for the second and third quarter 10-Qs.   On August 16, 1999, Master Graphics filed its Form 10-Q for the period ending June 30, 1999.   (Additional Facts [29] at ¶ 14.)   Plaintiff alleged that the reclassification caused the Company to understate its six-month pretax net loss in its August 1999 Form 10-Q by $896,000, or 42%.   (*Id.* at ¶ 15.)   On November 15, 1999, Master Graphics filed its Form 10-Q for the period ending September 30, 1999, and plaintiff alleged that the reclassification caused the Company to understate its nine-month pretax net loss in its November 1999 Form 10-Q by $896,000, or 14%.   (*Id.* at ¶ 17.)

9

Form S-8 registration statement,[6] which incorporated by reference the financial statements filed with Master Graphics' May 1999 Form 10-Q. (*Id.* at ¶¶ 10-12.)  At the close of trading on June 23, 1999, the stock price was $5 per share.  (*Id.* at ¶ 31.)  On June 24, 1999, Miller told Morgan Keegan that it would not meet its second quarter earning results.  As a result, Morgan Keegan downgraded Master Graphics from an "outperform" to "market perform," and lowered the Company's second quarter earnings estimate.  On June 28, 1999, the first business day after Master Graphics publicly confirmed Morgan Keegan's analysis, Morgan Keegan again reduced Master Graphics earnings target for the second quarter.  (Lawrence Dep. [28-39] at 5:7-14; 55:9-22.)  However, Miller tried to block these downgrades by telling Lawrence that if he downgraded Master Graphics, it would be "the biggest mistake [he'd] ever made."  (*Id.* at 59:19-60:4.)

The stock price fell drastically in response to the announcements: the share price closed on June 28, 2009 at $3.94 per share, 21% below the June 23 closing price of $5.00, and the value of Miller's shares had dropped to $15,799,400.  (*Id.* at 49:19-60:4.)

---

[6]  A Form S-8, which is made under the Securities Act, is generally a form to register the offer and sale of securities to the issuer's employees as a form of compensation or incentive.  Because these securities are offered for compensation and employees usually are familiar with the employer-issuer's business because of the employment relationship, securities registered pursuant to a Form S-8 require only abbreviated disclosures that would be inadequate in a capital-raising transaction.  (SEC, Final Rule, "Registration of Securities on Form S-8," available at http://www.sec.gov/rules/final/33-7646.txt, last accessed July 20, 2010.)

The falling stock price caused Prudential to begin making margin calls in Miller's account.  (Tr. [168] at 143:13-144:8.)  On July 2, 1999, Miller transferred $623,366 of his own funds to Prudential to maintain that firm's minimum equity requirement in his margin account.  (*Id.* at 144:3-8.)  He did not tell his executive committee about the margin loan until a conference call on July 15.  He also asked the division presidents collectively to loan him $3 million, but they refused.  (*Id.* at 146:4-25; 147:1-20.)  Over the next three weeks, defendant transferred an additional $204,487 of his own funds to Prudential to continue to maintain the firm's minimum equity requirement in his margin account.  (Additional Facts [29] at ¶ 34.) He testified that he was in a "panic" at this point.  (Tr. [168] at 147:21-23.)   While this payment temporarily satisfied the minimum equity requirement, Prudential demanded additional funds as the stock price shrunk further, and when Miller failed to comply, Prudential liquidated all Miller's Master Graphics shares in November and December 1999.  (Additional Facts [29] at ¶ 37.)  After the shares were liquidated, defendant still owed Prudential $393,000, but Prudential ultimately forgave this debt.  (*Id.* at ¶¶ 38, 39.)

**V.   The Fallout of the Plan**

On September 26, 2009, Fair sent Miller an e-mail that addressed the Plan, which stated:

> We indicated that the first quarter advances would be repaid when the division meets their numbers for the year or if the whole company meets numbers.  Since almost no division will make that, we need to execute a plan to get

11

AO 72A
(Rev.8/82)

> the advance repaid or run off the financials. I
> understand from [Henson] that he gave you some information
> a few weeks ago regarding this. Again, we need to develop
> a game plan of communication and action.

(Tr. [168] at 155:1-20, Tr. [169] at 246:2-10.) Miller sent out a form on November 22, 2009 to the division presidents for them to sign, which stated, "I will repay the loans that were made to me in the first quarter of the year" and in which they agreed retroactively to take a reduction of their salaries beginning in October. (Tr. [169] at 182:12-14; 20-24; 184:7-11; 184:13-14.) However, no division presidents signed the form, and they all asked for Miller's resignation. (*Id.* at 185:5-6; 187:12-14.)

Miller resigned from his positions as President and CEO, effective December 1, 1999, and resigned as Chairman effective February 1, 2000; Diehl succeeded him. (*Id.* at 187:20-25.) On February 18, 2000, Master Graphics issued a press release in which it first identified an issue with the accounting surrounding the Plan. (Def.'s Statement of Undisputed Material Facts ("Def.'s SUMF") [26] at ¶ 13.) The Dow Jones News Service reported on February 19, 2000 that Master Graphics discovered a "'potentially inappropriate deferral of certain compensation and rent expenses' paid in the first quarter of 1999 totaling about $1 million." (*Id.*) It said that the discovery would "delay until March the public release of its results of operations for the year ended Dec. 31" and that "the deferral could impact its unaudited financial statements for the periods

12

ending March 31, 1999, June 30, 1999, and Sept. 30, 1999, and may result in the restatements of those periods." (*Id.*)

On February 18, 2000, Master Graphics' stock closed at $0.75 a share, and on February 22, 200, the first day after the accounting issues were disclosed, it closed at $0.81 a share. (*Id.* at ¶ 14.) On February 23, 2000, it closed at $0.75 a share. (*Id.* at ¶ 15.) On April 13, 2000, Master Graphics issued another press release that stated that "[i]n addition to announcing its fourth quarter and full year results, . . . it would restate previously released quarterly financial statements" because it had "determin[ed] that the deferral of certain compensation and rent expenses of approximately $0.9 million ($0.5 million net of taxes) in the first quarter was inappropriate." (Def.'s SUMF [26] at ¶ 17.) The press release "also determined that depreciation expense and loss on sale of assets associated with its 1999 press replacement program was understated for the first three quarters of 1999" and that "[t]he aggregate impact of these restatements was to decrease net income by $0.7 million for the three months ended March 31, 1999, to increase net loss by $0.5 million and $1.2 million for the three months and six months ended June 30, 1999, and to increase net loss by $1.4 million and $2.6 million for the three months and nine months ended September 30, 1999." (*Id.* at ¶ 19.) Master Graphics stated that it had experienced a $96 million net loss for the previous quarter and a $105.2 million net loss for the year and that it continued to

13

experience "costs and problems associated with the installation and start up of its new printing presses" which "resulted in significant waste and shrinkage" at several locations.   (*Id.* at ¶¶ 20-21.)

During this period, the Independent Auditors Report filed with Master Graphics' Form 10-K[7] expressed "substantial doubt about the company's ability to continue as a going concern," given that Master Graphics "suffered losses from operations, is in violation of its debt covenants and has been unable to obtain waivers for debt covenant violations."   (Def.'s Mot. for Summ. J. [25] at Ex. V, Part 1 at 28.)   Additionally, Master Graphics noted in consolidated financial statements attached to its Form 10-K that it had experienced "significant declines in sales, operating income and operating cash flows" during 1999 and that its senior lender had issued a notice of default and warned that the Company's senior notes could be called.   (*Id.* at Ex. V, Part 2 at 16.)

The Complaint [1] alleged five counts against Miller: (1) fraud in connection with the offer or sale of Master Graphics' securities in violation of 15 U.S.C. § 77q(a), Section 17(a) of the Securities Act (Compl. [1] at ¶¶ 34-37); (2) fraud in connection with the purchase or sale of Master Graphics securities in violation of 15

---

[7]   A Form 10-K is a financial form that includes a company's audited financial statements and provides a comprehensive overview of a company's business and financial condition.   Every publicly traded company is required to file a 10-K at the end of its fiscal year. (Form 10-K, available at http://www.sec.gov/answers/form10k.htm, last accessed July 22, 2010.)

AO 72A
(Rev.8/82)

U.S.C. § 78j(b), Section 10(b) of the Exchange Act and Rule 10b-5 thereunder (*id.* at ¶¶ 38-41); (3) failing to implement a system of internal accounting controls or knowingly falsifying an accounting book, record, or account, in violation of 15 U.S.C. § 78m(b)(2)(A), Section 13(b)(2)(A) of the Exchange Act and Rule 13b2-1 thereunder (*id.* at ¶¶ 42-45); (4) aiding and abetting in violation of Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-13 thereunder (*id.* at ¶¶ 46-49); and (5) aiding and abetting in violation of Section 13(b)(2)(A) of the Exchange Act, "which occurred when Master Graphics, as an issuer of securities, failed to make and keep accounting books, records and accounts which accurately and fairly reflected its transactions and the disposition of its assets." (*Id.* at ¶¶ 50-52.)

In a jury trial before Magistrate Judge Alan J. Baverman ("Judge Baverman"), the jury found Miller liable as to all counts. (*See, e.g.,* Tr. [176].) Judge Baverman held a hearing ("the Remedies Hearing") on December 10, 2008 in which he indicated his preliminary thoughts regarding his ruling on remedies. (*See* Tr. [154].) Before Judge Baverman could issue remedies, however, he recused himself from the case. (*See* Order of Recusal [152].) Therefore, this Court will address remedies. Plaintiff seeks a civil penalty, a director and officer bar, an injunction against future violations of the federal securities laws, and disgorgement and prejudgment interest. (Pl.'s Br. [142] at 2.)

15

## DISCUSSION

I.   **Remedies**

A.   **Injunction**

Plaintiff asks the Court to issue a permanent injunction enjoining defendant (his agents, servants, employees, attorneys, and all persons in active concert or participation with them) from violating Section 17(a) of the Securities Act; Section 10(b) of the Exchange Act and Rule 10b-5 thereunder; and Section 13(b)(5) of the Exchange Act and Rule 13b2-1 thereunder, and for a permanent injunction enjoining defendant from aiding and abetting violations of Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-13 thereunder and Section 13(b)(2)(A) of the Exchange Act. (Plaintiff's Brief Supporting Imposition of Disgorgement, Prejudgment Interest, Civil Penalties, and an Officer and Director Bar Against John P. Miller ("Pl.'s Br.") [142] at 15-16.)

1.   **Standard for Injunction**

Under Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d), "[t]he SEC is entitled to injunctive relief when it establishes (1) a prima facie case of previous violations of federal securities laws, and (2) a reasonable likelihood that the wrong will be repeated." *SEC v. Calvo*, 378 F.3d 1211, 1216 (11th Cir. 2004) (affirming issuance of injunction). *See also SEC v. Blatt*, 583 F.2d 1325, 1334 (5th Cir.

16

1978)[8] ("To obtain injunctive relief the Commission must offer positive proof of the likelihood that the wrongdoing will recur. . . . The Commission needs to go beyond the mere fact of past violations.") (citation omitted).   In assessing whether the wrong will be repeated, the Court must consider:

> the egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of his conduct, and the likelihood that the defendant's occupation will present opportunities for future violations.

*Blatt*, 583 F.2d at 1334 n.29 (citations omitted).

### a.   **Previous Violations of Federal Securities Laws**

Defendant argues unpersuasively that the phrase "previous violations of federal securities laws" means that the violations must have occurred before the ones at issue in the present case.   (Opp'n [144] at 14.)   As authority for this proposition, defendant cites *Calvo*, in which the Eleventh Circuit granted an injunction, stating that "[a]s the district court recognized, this is not the first time [defendant] has violated federal securities laws." (*Id.*)   *See Calvo*, 378 F.3d at 1216.[9]   However, numerous courts have found no

---

[8]   Decisions of the former Fifth Circuit filed prior to October 1, 1981 constitute binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir. 1981) (*en banc*).

[9]   Defendant also cites *SEC v. Merchant Capital, LLC*, 400 F. Supp. 2d 1336, 1374 (N.D. Ga. 2005) (Shoob, J.), in which the court found that the SEC had not established the necessary factors for an injunction.   (*See, e.g.*, Opp'n [144] at 14.)   However, this case is

17

requirement that a defendant must have committed violations before the ones at issue. Indeed, the "previous" violations relied upon by federal courts as a basis for injunctive relief are frequently the same ones just proven in the liability portion of those cases. *See, e.g., SEC v. First City Fin. Corp., Ltd.*, 688 F. Supp. 705, 725 (D.D.C. 1988) ("While it is true that defendants have never before faced federal securities law violations, that alone, does not militate against imposing an injunction"); *SEC v. Shapiro*, 494 F.2d 1301, 1308 (2d Cir. 1974) ("first offenders are not immune from injunctive relief") (internal quotation marks omitted); *SEC v. Phoenix Telecom, L.L.C.*, 239 F. Supp. 2d 1292, 1296-99 (N.D. Ga. 2000) (Camp, J.) (granting injunctive relief because SEC had established prima facie case that securities laws had been violated in that instance).

As a jury found that Miller had violated several federal securities laws in this case, the Court finds that plaintiff has made a sufficient showing that defendant has previously violated the

---

not good law. The SEC appealed the case, and it was remanded by the Eleventh Circuit, which determined that because "the issuance of an injunction involves questions of fact of whether scienter or negligence was involved as well as the other factors mandated," "[t]he district court is directed to assess these questions of fact and determine whether the SEC is entitled to the issuance of a permanent injunction." *SEC v. Merchant Capital, LLC*, 311 F. App'x 250, 252 (11th Cir. 2009). The Eleventh Circuit even noted that "based on the record before [it], [it] would be inclined to order the district court to issue a permanent injunction." *Id.* While defendant filed its brief before the Eleventh Circuit opinion was issued, defendant should have filed this supplemental authority once the relevant case was published.

AO 72A
(Rev.8/82)

federal securities laws.  Judge Baverman also found that plaintiff had met its burden of making a prima facie case as to a previous federal securities law violation.  (Tr. [154] at 91:16-19.)

### b.   Likelihood That the Wrong Will Be Repeated

In determining the likelihood of future violations, courts consider the totality of the circumstances.  *SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980).  The Court will address each of the factors and whether they weigh in favor of granting an injunction.

### (1)   Egregiousness of Defendant's Actions

Plaintiff argues that Miller's conduct was egregious because he: (1) directed his staff to reclassify rents and salaries as loans, even though he knew the division presidents had not agreed to the Plan; (2) placed his personal desire for wealth ahead of the interest of Master Graphics' employees and shareholders by focusing on the stock price instead of improving the Company's performance "in real ways"; and (3) defrauded investors who purchased Master Graphics shares while the price was artificially inflated.[10]  (Pl.'s Br. [142] at 13.)

---

[10]   Defendant argued that plaintiff presented no evidence or expert testimony to show that the investing public would have been deceived or defrauded by the non-disclosure of the Plan or the financial impact of the Plan in the first quarter of 1999 (*see, e.g.,* Opp'n [144] at 27).  However, plaintiff is not required to prove reliance by investors on the false statements.  *See, e.g., Geman v. SEC*, 334 F.3d 1183, 1191 (10th Cir. 2003).  Additionally, plaintiff did introduce evidence that established overstated earnings over three quarters. (*See* Reply [148] at 11.)

AO 72A
(Rev.8/82)

Defendant states that his actions were not egregious enough to warrant an injunction because: (1) he believed that the development and instituting of the Plan were legitimate from an accounting and legal perspective; (2) he believed all the division presidents with whom he spoke agreed to the Plan, and (3) he never had reason to believe his actions in the case were wrong.  (Opp'n [144] at 18.)

Defendant also states that plaintiff cannot support its claim that investors were defrauded, relying heavily on a Southern District of Texas case that found: "the Court is unable to conclude that [an unsupportable showing of drop in stock] [wa]s enough to make [d]efendant's violation egregious, so as to warrant injunctive relief.  Additionally, even if the information about [the company's] first quarter adjustments had a $2.91 per share effect on [the company's] stock . . . this is not enough to make [d]efendant's actions so egregious as to require a permanent injunction." *SEC v. Snyder*, No. H-03-04658, 2006 WL 6508273, at *3 (S.D. Tex. Aug. 22, 2006).

In other cases in the Northern District of Georgia, however, courts have frequently found that defendants have acted egregiously when they have misled investors.  *See, e.g.*, *SEC v. ETS Payphones, Inc.*, 123 F. Supp. 2d 1349, 1355 (N.D. Ga. Nov. 20, 2000), *aff'd*, *SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 737 (11th Cir. 2005) (finding that defendant acted egregiously "in operating an investment scheme at a significant loss while only he profited.  While the company lost

20

millions, [d]efendant sponsored a NASCAR racing team, purchased a home on Sea Island, and received $700,000 in 'consultant' fees from another payphone enterprise."); *Phoenix Telecom, LLC*, 239 F. Supp. 2d at 1299 ("[d]efendants['] conduct was egregious, systematic, and continuous for a number of years" when promoters made false statements in sales literature); *SEC v. Crowell & Co., Inc.*, Civ. A. No. CV190-211, 1992 WL 206270, at *6 (S.D. Ga. July 1, 1992) (finding that "violations are sufficiently egregious, although minimally so, to warrant an injunction," because while "the action with respect to both violations could be said to be harmless," "the discrepancies [in documents filed with the SEC] are not entirely harmless and have a potential for further mischief simply by way of their historical inaccuracy."); *SEC v. Global Express Capital Real Estate Inv. Fund, I, LLC*, 289 F. App'x 183, 189 (9th Cir. 2008) (finding that district court did not abuse its discretion in issuing a permanent injunction against defendant because her behavior was "egregious and recurring" in misleading investors in multiple ways) (internal quotation marks omitted). *Cf. Blatt*, 583 F.2d at 1335 (reversing district court's grant of injunction against one defendant because "[a]lthough we have concluded that [he] violated Rule 10b-5, the infraction cannot fairly be termed egregious. [His] involvement [failing to disclose beneficial ownership of shares] was relatively minor.")

AO 72A
(Rev.8/82)

The Court concludes that defendant's behavior is sufficiently egregious given his repeated lies to Fair and Henson about the division presidents' agreement to the Plan.

### (2)   Isolated   or   Recurrent   Nature   of   the Infraction

Plaintiff argues that there was a "recurrent aspect" to Miller's misconduct because Miller caused Master Graphics to misrepresent its earnings in financial statements for three successive reporting periods.  (Pl.'s Br. [142] at 14.)

Defendant argues that this offense is isolated because the infractions at issue all relate to the Plan, which was one isolated occurrence (Opp'n [144] at 17), and an isolated occurrence does not warrant injunctive relief.  *See SEC v. Bausch & Lomb, Inc.*, 565 F.2d 8, 18 (2d Cir. 1977) (denying injunction because judge determined "past transgression was no more than an isolated occurrence"; "[i]llegal activity, without more, does not automatically justify the issuance of an injunction[;] [t]he SEC must show a cognizable risk of future violation, something more than the mere possibility which serves to keep the case alive.") (citations and internal quotation marks omitted).

Defendant also cites *Snyder*, in which the SEC alleged that defendant filed a materially false and misleading Form 10-Q for the first quarter of 1999.  (Opp'n [144] at 17-18.)  *See Snyder*, 2006 WL 6508273, at *1.  The *Snyder* court stated that the fact that the "case involved more than one charge" did not demonstrate "that [d]efendant

engaged in or was accused of engaging in the violation of any securities laws prior to the events of early 1999. Further, there is no evidence that [d]efendant violated the securities laws subsequent to the events underlying the present case." *Id.* at *4.

Despite the fact that the Plan was arguably only a one occurrence matter, the Court finds that defendant acted repeatedly, as he went to Fair and Henson twenty times to tell them that the division presidents had agreed to the Plan. The Plan also affected three separate 10-Qs. Therefore, the Court concludes that defendant's actions were not isolated.

### (3) Degree of Scienter Involved

Plaintiff argues that Miller's conduct shows a high level of scienter because he repeatedly lied to Henson and Fair by saying that presidents had agreed to the Plan. (Pl.'s Br. [142] at 14.) The jury found him liable on three counts of fraud, including the scienter-based count of Section 10(b) of the Exchange Act, based on his having made false statements of material fact. (*See, e.g.,* Tr. [176].) Defendant makes no argument in response about scienter. (*See generally* Opp'n [144].)

Judge Baverman also noted at the Remedies Hearing that he believed "that Mr. Miller's view of the matter today still reflects a high level of scienter." (Tr. [154] at 93:7-9.) The Court agrees and therefore concludes that Miller's level of scienter weighs in favor of an injunction.

23

### (4)   Sincerity of Defendant's Assurances Against Future Violations

Plaintiff argues that Miller has offered no meaningful assurances against future violations. (*See, e.g.*, Pl.'s Br. [142] at 2, 15.) Defendant argues, however, that "it goes without saying that Mr. Miller has no intention of violating the federal securities laws in the future." (Opp'n [144] at 20.) Defendant states that he has "lost everything that he had acquired prior to this trial and verdict," that his "personal and professional reputation ha[d] been severely weakened as a result of this trial and verdict," and that he "is deeply pained by what has transpired in his life over the past nine years." (*Id.*) However, this testimony is inapposite, as it relates to his past conduct, not to any future assurances.

In the Remedies Hearing, when asked by his attorney about his assurances against future violations, defendant stated:

> Q.  You know, words are words but I would ask the judge to look at my entire 30-year history as a businessman.   I would ask him to look at what others have said about me in reference to even letters from people that were part of MasterGraphics and others.

> A.   I don't believe that I have a history of stretching the truth.   I don't believe that I have a history of fraudulent action.   I don't believe that I have a history of misleading investors.   And I don't know what opportunities will be before me in the capacities that I've had historically because of this guilty verdict.   But no, all that I can do is promise that – I promise there has been nothing in the past but I certainly promise there will be nothing in the future.

> Q.   This is certainly not something that you and your family want to go through again?

24

A.   No.

(Tr. [154] at 57:20-25; 58:1-10.)

However, regardless of defendant's assurances, such assurances are not given significant weight. *See, e.g., SEC v. Ginsburg*, 362 F.3d 1292, 1305 (11th Cir. 2004) (finding district court abused its discretion by denying SEC's request for injunction because of defendant's assurances he would not engage in any actions that would raise suspicion of illegal conduct).   Moreover, as noted *infra*, Miller accepts no responsibility for his conduct, but instead blames everyone else for his plight.   Such self-pity and propensity for rationalization greatly undermine defendant's assurances.

Accordingly, the Court finds that this factor weighs in favor of plaintiff.

### (5)   Defendant's Recognition of the Wrongful Nature of His Conduct

Miller has also not acknowledged the wrongfulness of his conduct.   Defendant points to his testimony at trial that he never intended to commit fraud and that all division presidents agreed to the Plan.   (Opp'n [144] at 20-21.)   Specifically, he testified as follows:

Q.   Mr. Miller, if at any time you had been told this plan was not GAAP, the disclosure was inadequate, the division presidents had not agreed to this plan, would you have gone forward with it, would you have reclassified the earnings and expenses and gone forward with these numbers?

A.   No, sir, I would not.

25

Q.    And why is that, sir?

A.    I owned a company that had 2000 employees and 300
      million in sales with 43 million of cash flow EBITDA
      [earnings before interest, taxation, depreciation,
      and amortization] and  based upon the purchase basis
      of the companies.   Why would I have done something
      that all it took was one individual to say that he
      didn't agree to something?  Why would I have exposed
      myself  and  my  family  to  nine  years,  basically
      destroying our reputations over one stupid mistake.
      Sir, I am not the smartest guy on the planet but I
      can assure you that I am not that dumb.

(*Id.*; Tr. [168] at 80:6-21.)   However, while this testimony shows

that Miller is unhappy with the outcome, he nowhere acknowledges the

wrongfulness  of  the  conduct.     Furthermore,  this  testimony  was

disputed by several witnesses, including division presidents, and was

rejected by the jury.

     Plaintiff stresses the fact that Miller is unrepentant.  (Pl.'s

Resp. [180]; *see also* Tr. [154] at 74:1-2 ("I don't know that I've

ever seen more of a lack of recognition of the wrongful conduct of

the defendant."))   At the Remedies Hearing, defendant blamed the

jury, the three SEC attorneys, and the division presidents for the

verdict against him.    (*Id.* at 8:1-5; 9:17-22 (stating that the

division presidents "lied" and were "simple in their thinking"); *id.*

at 10:20-23; 10:8-9 (stating that the three SEC attorneys "have

intentionally, [] over the last nine years – I don't view this as the

government, it's you three – you three make the decision of how to

ruin a person's life"[11] and that their "sole objective was to confuse the jury"); *id.* at 2:10-25; 13:1-24 (stating that the jury wanted to "tar and feather" him because he was a CEO, and the "public right now has a general viewpoint" that all CEOs are guilty)). He agreed with the statement that "there is a [guilty verdict] out there, but [he] didn't do it," and that he is the "victim in all this." (*Id.* at 12:7-9; 59:22-23.)

Judge Baverman was unpersuaded by these arguments, stating that "if the jury was thinking like the court was thinking, it did not find the defendant's testimony to be credible," that he did not "see any realization by [defendant] that a fair and impartial jury would look at this evidence and find that [he] violated the securities laws," and that "[t]here is no acceptance of responsibility, to borrow from the sentencing guidelines . . . there is no inclination [sic] in [defendant's] statements that [he] did wrong." (Tr. [154] at 89:8-10, 23-25; 90-6.) He stated that "[t]he jury was very intelligent, and [] a jury can differentiate" "between argument and fact and this jury did not, in my opinion, put a strike against Mr. Miller for being a CEO of a company. . . . [it] can distinguish those

---

[11]   He went on to ask plaintiff's attorneys, "So did you know I was innocent? Yes. What happened was we got too far into this case, the SEC had too much invested and you couldn't drop the case. So am I bitter about it? I'm bitter that I didn't put it in writing to save the issues with my family but I'm bitter at you three individuals because your decision to chase me and pursue me had nothing even to do with what the original case was." (Tr. [154] at 11:10-16.)

CEOs who act responsibly and those who do not, and [] that's what they saw in this case." (*Id.* at 88:21-24.) Finally, he noted that "[t]he fact that other people did wrong or may have done wrong or could have been the greater subject of the SEC's attention does not excuse [defendant's] conduct as found by the jury, who, after all, observed all of these individuals who came in and testified"; rather, "[t]his case was about [defendant's conduct and the jury found that [his] conduct violated the law." (*Id.* at 90:7-12.)

The Court has reviewed the record and it concurs with Judge Baverman's assessment. The Court concludes that Miller has not shown sufficient recognition of the wrongful nature of his conduct, and accordingly this factor weighs in favor of plaintiff.[12] *See SEC v. Lipson*, 278 F.3d 656, 664 (7th Cir. 2002) ("[t]he criminal who in the teeth of the evidence insists that he is innocent, that indeed not the victims of his crime but he himself is the injured party,

---

[12] Plaintiff also argues that Miller's arbitration against Morgan Keegan, in which Miller demands over $71 million in damages and blames Morgan Keegan for the downfall of Master Graphics, highlights his refusal to accept responsibility. (Pl.'s Br. [142] at 4 n.1; Pl.'s Resp. [180] at 4 n.5.) Defendant alleged that Morgan Keegan reneged on a promise to grant him personally a margin loan for 50% of the post-IPO market value of his Master Graphics stock, instead loaning him only 10% of the value, and accused Morgan Keegan of spreading negative information about Master Graphics and him personally in the market, which led to the Company's demise. (Pl.'s Resp. [180] at 2 n.2.) The arbitration dismissed Miller's claims with prejudice; he states that the case was dismissed on a technicality. (Tr. [154] at 52:4-5.) However, this case involves promises and assurances Miller was given by Morgan Keegan prior to the IPO, so the Court finds it is irrelevant to the instant determination of remedies.

AO 72A
(Rev.8/82)

demonstrates by his obduracy the likelihood that he will repeat his crime, and this justifies the imposition of a harsher penalty on him.").

### (6)   Likelihood that Defendant's Occupation Will Present Opportunities for Future Violations

Plaintiff argues that Miller is a serial entrepreneur and promoter who has been involved in large deals since the 1980s. (*See,* *e.g.,* Pl.'s Br. [142] at 15.)   Starting in 2002 and during the pendency of this case, he attempted to put together a large deal to create a new commercial airline, DirectAir, with billions of dollars of investor funding  and $300 million in loan guarantees from the state of Louisiana.  (*See* Miller Aff., attached as Ex. 4 to Opp'n [144] at ¶ 4.)   Judge Baverman stated during the Remedies Hearing that "obviously, there is an opportunity for future violation because this is Mr. Miller's business."  (Tr. [154] at 93:15-16.)

Defendant argues that the verdict against him has made it difficult for him to be presented with opportunities to violate the federal securities laws, stating that after the verdict was made public in 2007, he came to an agreement with potential financiers and management of DirectAir that he would not have an executive-related role or board of director position with DirectAir.  (*Id.* at ¶¶ 6, 7.)

Defense counsel provided numerous letters in support of Miller, including from his wife, former colleagues, and a Louisiana state senator.  (*See* Exs. A1-A9 to Opp'n [144].)   The Court notes that some of these letters are from the early 1990s, and others are from 2002,

29

well before the Complaint [1] was filed in this case in June 8, 2004. (*See id.*)  The most salient recommendation comes from Andrew LaTrobe, a loan officer with whom Miller worked on the DirectAir deal, who wrote, "For almost eight years[,] I have seen no evidence of any attempt by Mr. Miller to exaggerate the facts for the purpose of reaching a goal, in spite of the billions of dollars of potential value (and annual economic impact) that could be created for a region in desperate need."  (Ex. A1 of Ex. 4 to Opp'n [144].)  Miller's wife wrote to the Court on October 22, 2008 that the only paying job he has

> is leading the music for a satellite church that pays him $300/week.  That is our only steady source of income.  He occasionally gets a consulting job that helps financially, but now that he has been found guilty of civil fraud, I am sure that source of income may be affected as well.

(Ex. A2 to Opp'n [144].)

Despite defendant's apparent lack of current job prospects,[13] the Court finds that defendant's background as an entrepreneur and his proven ability to start a private company and take it public weighs in favor of an injunction.  *See Commodity Futures Trading Comm'n v. Sidoti*, 178 F.3d 1132, 1137 (11th Cir. 1999) (affirming district court's injunction against future violation of Commodity Exchange Act given likelihood of future violation).

---

[13]  As plaintiff has noted, it is somewhat disturbing that, in the many years since the demise of the company, the defendant has never obtained a traditional 9-5, wage-paying job.  Instead, he seems to always be in pursuit of the next big deal.

30

Judge Baverman noted that, in totality, "the SEC has established a reasonable likelihood that the wrong will be repeated." [14] (Tr. [154] at 92:20-21; 93:1-6.)  The Court agrees, noting that defense counsel essentially conceded the necessity of an injunction.[15] Accordingly, because of defendant's intentional, knowing conduct, the Court imposes a permanent injunction against defendant.  *See Ginsburg*, 362 F.3d 1292 at 1305 (stating that "[i]f no injunction is to be entered where every factor weighs in favor of an injunction, then the factors would be meaningless.  They are not, and it was a clear error of judgment not to enjoin [defendant] to refrain from violating the securities laws in the future"; injunctions are reserved for "intentional, knowing conduct, as opposed to more minor, technical violations"); *SEC v. Scherm*, 854 F. Supp. 900, 908 (N.D. Ga. 1993) (Forrester, J.) (issuing injunction because "conduct was repeated and of significant value.  The repeated nature of his wrongdoings indicates a blatant disregard for securities laws and the sanctity of other people's money.  Given his sophisticated business background and his continued denial of any wrongdoing, this court finds that the evidence provides sufficient grounds to support a

---

[14]  He also correctly noted the risk of bad precedent by not imposing an injunction: that future defendants would refer to this case and state, "See, even a judge didn't believe the jury verdict." (Tr. [154] at 93:14.)

[15]  Defense counsel stated, "We are not sitting here saying nothing is going to happen off a jury verdict.  We understand," but "[w]e just weren't going to concede it." (Tr. [178] at 19:1-5.)

31

permanent injunction to prevent further violations."); *SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1322 (11th Cir. 1982) (affirming district court's injunction of defendant where virtually all factors cut against defendant).

**B.  Disgorgement, Prejudgment Interest, and Civil Penalties**

Plaintiff asks the Court to issue an order requiring defendant to disgorge any ill-gotten gains together with prejudgment interest and requiring defendant to pay civil monetary penalties.

**1.  Disgorgement**

Plaintiff argues for disgorgement in the amount of $10,184. (Pl.'s Br. [142] at 2.)

**a.  Standard for Disgorgement**

Once a court determines that a federal securities law violation has occurred, it has broad equitable powers to fashion appropriate remedies, including ordering culpable defendants to disgorge their profits. *SEC v. Lorin*, 76 F.3d 458, 461-62 (2nd Cir. 1996); *see also SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474-75 (2nd Cir. 1996) (district courts have broad discretion to determine whether to order disgorgement and the amount to be disgorged).  In fact, district courts have so much latitude in these matters that a decision not to order disgorgement will not be disturbed by an appellate court unless it is established that the district court abused its discretion.  *See, e.g.*, *First Jersey Sec.*, 101 F.3d at 1475; *SEC v. Posner*, 16 F.3d 520, 522 (2nd Cir. 1994).

32

The primary purpose of disgorgement as a remedy for violation of the securities laws is to deprive violators of their ill-gotten gains. *SEC v. Wang*, 944 F.2d 80, 85 (2nd Cir. 1991); *see also Blatt*, 583 F.2d at 1335 (the remedy of disgorgement is designed both to deprive a wrongdoer of his unjust enrichment and to deter others from violating the securities laws). Because disgorgement is remedial and not punitive, the court's power to order disgorgement "extends only to the amount with interest by which the defendant profited from his wrongdoing." *Id.*

"The SEC is entitled to disgorgement upon producing a reasonable approximation of a defendant's ill-gotten gains." *Calvo*, 378 F.3d at 1217. The disgorged amount must be causally connected to the violation. *Id.* Once the SEC meets its burden of producing a reasonable approximation of defendant's ill-gotten gains, "[t]he burden then shifts to the defendant to demonstrate that the SEC's estimate is not a reasonable approximation." *Id.* In determining whether the SEC has met its burden, "[e]xactitude is not a requirement; '[s]o long as the measure of disgorgement is reasonable, any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty.'" *Id.* (citations omitted).

### b.   Analysis

In denying defendant's Motion for Summary Judgment [25], the Court rejected all defendant's theories for disgorgement except for the interest theory. (*See* July 31, 2006 Order [52] at 37.) This

33

theory stated that Miller's ill-gotten gain equaled the interest on the $827,000 that he paid to satisfy the initial margin call from Prudential on July 2, 1999: specifically, had he not inflated the first quarter earnings, the poor earnings would have caused the price of the Company's stock to drop below $4.25 (the price that triggered the margin call) in or around May 17, 1999 rather than July 1999. (Pl.'s Br. [142] at 19.)

The Court may take judicial notice of prevailing prime rates of interest during that time, which was 7.75%. *See Levan v. Capital Cities/ABC, Inc.*, 190 F.3d 1230, 1235 n.12 (11th Cir. 1999); http://www.federalreserve.gov/releases (identifying prime interest rates). Applying the prevailing interest rate, the ill-gotten gain is $10,184.[16]

Judge Baverman indicated at the Remedies Hearing that he would issue the disgorgement of $10,184. (Tr. [154] at 93:17-24; 94:17; 96:10-12.) The Court, however, concludes that this item of enrichment was more theoretical, than real, and declines to do so.[17]

---

[16] This figure is derived by multiplying ($827,000 X (7.75%, the prevailing interest rate) X (55 days/365)).

[17] The Court notes, as it did in its July 31, 2006 Order, that "the amount of interest attributable to this delay is *de minimus*, in the scheme of things and arguably not worth the litigation expense and court resources expended in litigating this theory." (*See* July 31, 2006 Order [52] at 36 n.13.)

34

### 2.    Prejudgment Interest

Plaintiff argues that defendant should be required to pay prejudgment interest on this disgorgement in an amount of $8,476.51. (Pl.'s Br. [142] at 20.)

### a.    Standard for Prejudgment Interest

Like the decision to grant disgorgement and the decision about the amount of disgorgement, the decision whether to award prejudgment interest is left to the Court's broad discretion. *First Jersey Sec.*, 101 F.3d at 1476.  "[R]equiring the payment of interest prevents a defendant from obtaining the benefit of what amounts to an interest free loan procured as a result of illegal activity."  *SEC v. Robinson*, No. 00 Civ. 7452 RMB AJP, 2002 WL 1552049, at *9 (S.D.N.Y. July 16, 2002) (citations and internal quotation marks omitted).

### b.    Analysis

Defendant argues with the calculation mechanism plaintiff used to determine the amount of prejudgment interest, stating that plaintiff's calculation began the prejudgment interest period too early.  (Opp'n [144] at 39-40.)  However, defendant does not state the amount he actually wants.  (*See id.*)  Furthermore, no federal statute expressly controls the amount of prejudgment interest applicable to disgorgement awards in securities fraud cases, and in the absence of a controlling statute, district courts have the discretion to award or not award prejudgment interest.  *SEC v. Carrillo*, 325 F.3d 1268, 1269 (11th Cir. 2003).

35

Judge Baverman indicated he was not likely to award prejudgment interest because of the long delay in trying the case. (Tr. [154] at 94:12-16 ("This case has gone on for a long time and I don't think it's the fault of anybody, so I think that all the delay involved attributing the interest to Mr. Miller, whatever that amount is . . . that just doesn't seem right[;] I would [only] impose a disgorgement.").) The Court likewise declines to impose prejudgment interest.

### 3.   Civil Penalties

Defendant argues again that the SEC's claim for a civil penalty is time-barred. (Opp'n [144] at 23.) The Court has already rejected this argument in defendant's Motion for Summary Judgment [25], and it will therefore consider the issuance of a civil penalty. (*See* July 31, 2006 Order [52].)

In plaintiff's initial brief regarding remedies, it did not recommend a specific amount of civil penalty, although it stated that the Court could award up to $880,000. (Pl.'s Br. [142] at 21.) During the October 8, 2009 hearing, the Court suggested that the SEC should recommend a dollar amount for the civil penalty against defendant. (*See* October 8, 2009 Tr. [178] at 11-12.) Accordingly, the SEC filed a Clarification Regarding Civil Penalties [183] and requested that the Court impose a civil penalty in the amount of $225,000.

36

### a.    Standard for Civil Penalties

Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act provide that the SEC may seek to have a Court impose civil penalties. A civil penalty is determined "in light of the facts and circumstances" of a particular case. 15 U.S.C. § 78u(d)(3)(B)(i). First tier penalties (arising from conduct that occurred before February 1, 2001, but not earlier than 1996) can be imposed up to the larger of $5,500 for a natural person or $55,000 for any other person, for each violation, or the amount of ill-gotten gain. 15 U.S.C. § 78u(3)(B)(i). When the violation involves fraud, second tier penalties may be imposed up to $55,000 for a natural person or $275,000 for any other person, for each violation, or the amount of the ill-gotten gain. 15 U.S.C. § 78u(B)(ii). A third tier civil penalty of up to the larger of $110,000 for a natural person or $550,000 for any other person, for each violation, or the amount of ill-gotten gain may be imposed when any provision of the Securities Act or the Exchange Act is violated, if the violation involved fraud or deceit and the violation resulted in substantial losses or created a significant risk of substantial losses to other persons.[18]   15 U.S.C. § 78u(3)(B)(iii)(bb). In determining whether

---

[18]   Civil monetary penalties pursuant to the Securities Act and the Exchange Act are required to be adjusted for inflation, but Miller's conduct occurred in 1999, before the time that the adjustment became effective in early 2001, so this amount is the amount for the relevant time of the violation. 17 C.F.R. § 201.1001.

to award civil penalties, courts consider numerous factors, including the egregiousness of the violation, the isolated or repeated nature of the violations, the degree of scienter involved, whether the defendant concealed his trading, and the deterrent effect given the defendant's financial worth.  *SEC v. Sargent*, 329 F.3d 34, 42 (1st Cir. 2003).

### b.   Analysis

Because the relevant statutes authorize penalties for "each violation," courts are empowered to multiply the statutory penalty amount by the number of statutes the defendant violated, and many do. *See, e.g.*, *SEC v. Moran*, 944 F. Supp. 286, 296 n.13 (S.D.N.Y. 1996) (for individual defendant found liable for four statutory violations and two rule violations, court noted that second tier penalty could be up to six times the $50,000 statutory amount, or $300,000). Plaintiff initially argued in its Brief Supporting Imposition of Disgorgement, Prejudgment Interest, Civil Penalties, and an Officer and Director Bar Against John P. Miller [142] that the Court should impose a penalty based on the eight rules and statutes Miller violated, for a total of $880,000.   (Pl.'s Br. [142] at 21.) Defendant argued, however, that because defendant was accused of conducting a single comprehensive scheme, the scheme should be considered a single violation.  (Opp'n [144] at 30.)

In finding Miller liable on all counts, the jury found that Miller's conduct involved fraud on the first three counts; therefore,

38

a second or third tier penalty is appropriate for those counts.  *See*
*generally* 15 U.S.C. § 78u(3)(B). Defendant has argued that plaintiff
has failed to show the applicability of a third tier penalty, because
plaintiff has neither shown that substantial losses actually occurred
or that there was the risk of same.

The Court concludes that an argument could certainly be made
that Miller's conduct created a significant risk of substantial
losses to other persons.   15 U.S.C. § 78u(3)(B)(iii)(bb).   The
significant drop in Master Graphics' share price after the Company
announced it would not meet its second quarter earnings target shows
defendant's earlier manipulation of Master Graphics' earnings created
"significant risk of substantial losses"; for example, the share
price dropped 21% after it was announced in June 1999 that Master
Graphics would not meet its second quarter earnings target.   *Id.*
Yet, defendant is also correct that the SEC has not seemed
particularly enthusiastic in making this argument.  As the Court's
ultimate penalty can be supported without the need to decide this,
the Court does not reach the question whether third tier penalties
are applicable.

The Court also concludes that an analysis of the *Sargent* favors
assessing a civil penalty.  *Sargent*, 329 F.3d at 42.   The Court has
already determined that Miller's conduct was egregious, involved a
high level of scienter, and was more than "one isolated scheme."
(Opp'n [144] at 28.)   Defendant argues that his actions were not

39

egregious because his conduct "did not involve significant falsification of financial records." (*Id.* at 27.) He also argues that his scheme did not involve a high degree of scienter because his scheme was "open and notorious" and he did not "take great measures to conceal the plan from Company insiders . . . ." (*Id.* at 12, 28.) However, Miller's conversations outside the presence of Fair and Henson, as well as his keeping the Plan from the Company accountant and investors, contradict this assertion. (*See, e.g.*, Pl.'s Resp. [180] at 14.) Defendant argues that he did not gain a large personal benefit, but instead lost everything. (*See, e.g.*, Tr. [154] at 80:3-7 ("This was a very narrow, very narrow scheme . . . . It was a plan that he imposed on others as well as himself. This is not a CEO who was high-handed and wasn't willing to put his own salary at risk. He got no severance, [] no economic benefit from this."))

This argument is also unpersuasive, as defendant stood to gain a great deal of money because he hoped his shares of Master Graphics would become worth as much as $200 million. (Pl.'s Resp. [180] at 6). Defendant also argues that he should not have to pay a civil penalty because he has already undergone and will continue to undergo suffering as a result of this verdict. (*See, e.g.*, Opp'n [144] at 24.) Defendant cited *Snyder*, in which the court found that:

> The SEC's arguments [for a civil penalty] trivialize the devastating effects that Defendant has suffered on account of this litigation. . . . the Court finds that Defendant's prospects of ever again working for a public company are nonexistent, and his chances for employment in accounting at a level even remotely commensurate with his education

40

> and experience are very close to nonexistent. Having been
> precluded from working for certain [] clients as a result
> of the jury's verdict against him, Defendant is no longer
> able to earn a high income, or perhaps even a modest one.
> Defendant has amply demonstrated the financial hardship and
> extreme emotional toll that he has suffered, the effects
> of which he will likely experience for years into the
> future. This hardship and Defendant's current financial
> situation indicate that imposing civil penalties would be
> inappropriate.

*Snyder*, 2006 WL 6508273, at *12.[19] (Opp'n [144] at 25.)  However, even

when courts consider alleged hardships, they still often impose

remedies after examining the record in totality.  *See, e.g.*, *Meadows*

*v. SEC*, 119 F.3d 1219, 1228 n.21 (5th Cir. 1997) (affirming SEC's

administrative decision to bar broker from association with broker-

dealers, with right to reapply in two years, and imposing $1000,000

fine, despite defendant's claim that the bar was a "death knell" for

his career).

Furthermore, the Court has taken defendant's financial

circumstances into account in setting a penalty.  Yet, even though

defendant is not presently employed and he states that he and his

wife have less than $5,000 in total assets, Miller still has the

---

[19]   Defendant cites other cases from district courts around the
country in which defendants were not assessed civil penalties because
they were impecunious or because they did not gain a large personal
benefit.  (*See* Opp'n [144] at 29, 31.)  However, these cases are not
controlling or binding on the Court.  More importantly, the Eleventh
Circuit has stated that "nothing in the securities laws expressly
prohibits a court from imposing penalties or disgorgement liability
in excess of a violator's ability to pay."  *SEC v. Warren*, 534 F.3d
1368, 1370 (2008).

potential to acquire enough money to pay a substantial fine.   (Opp'n [144] at 29.)

Accordingly, considering all the above factors, the Court assesses a civil penalty of $75,000, against defendant.

### C.   Director and Officer Bar

Plaintiff requests the Court enter an Order permanently prohibiting defendant from acting as an officer or director of any issuer of securities registered with the SEC pursuant to Section 12 of the Exchange Act, or required to file reports with the SEC pursuant to Section 15(d) of the Exchange Act.   (Pl.'s Br. [142] at 15-16).

#### 1.   Standard for Director and Officer Bar

Section 21(d)(2) of the Exchange Act and Section 20(e) of the Securities Act provide for officer and director bars and penalties. *See* 15 U.S.C. § 78u(d)(2)[20]; 15 U.S.C. § 77t(e).[21]   The Court may enter

---

[20]   15 U.S.C. § 78u(d)(2) states that

the court may prohibit, conditionally or unconditionally, and permanently or for such period of time as it shall determine, any person who violated section 78j(b) of this title or the rules or regulations thereunder from acting as an officer or director of any issuer that has a class of securities registered pursuant to section 78l of this title or that is required to file reports pursuant to section 78o(d) of this title if the person's conduct demonstrates unfitness to serve as an officer or director of any such issuer.

15 U.S.C. § 78u(d)(2).

[21]   15 U.S.C. § 77t(e) states that

42

such an order if it finds that defendant's "conduct demonstrates unfitness to serve as an officer or director of any such issuer." 15 U.S.C. § 78u(d)(2).  The Court has substantial discretion in determining whether to determine such a bar.  *SEC v. Amazon Nat'l Treasures*, 132 F. App'x 701, 703-04 (9th Cir. 2005).

The relevant statutes were amended in 2002 as part of the Sarbanes-Oxley Act ("Sarbanes-Oxley") to substitute the term "unfitness" for "substantial unfitness"; *i.e.*, a defendant's conduct must demonstrate "unfitness to serve as an officer or director of any such issuer."  15 U.S.C. § 78u(d)(2); *see* Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, § 305(a)(1)-(2), 116 Stat. 745, 778-779 (2002). Congress's intent was to reduce the government's burden.  *See* S. REP. 107-205, at 27 (2002) ("The Commission has argued that the 'substantial unfitness' standard for imposing bars is inordinately high, causing courts to refrain from imposing bars even in cases of egregious misconduct.  The amended legislation rectifies this

---

In any proceeding under subsection (b) of this section, the court may prohibit, conditionally or unconditionally, and permanently or for such period of time as it shall determine, any person who violated section 77q(a)(1) of this title from acting as an officer or director of any issuer that has a class of securities registered pursuant to section 78l of this title or that is required to file reports pursuant to section 78o(d) of this title if the person's conduct demonstrates unfitness to serve as an officer or director of any such issuer.

15 U.S.C. § 77t(e).

43

deficiency by modifying the standard governing imposition of officer and director bars from 'substantial unfitness' to 'unfitness.'").

Furthermore, the parties disagree on whether the Court should apply the "unfitness" test or the "substantial unfitness" test, as the conduct at issue occurred in 1999, before the statute was amended, and courts apply slightly different criteria to the two tests.

The criteria for the "substantial unfitness" test were as follows: "(1) the 'egregiousness' of the underlying securities law violation; (2) the defendant's 'repeat offender' status; (3) the defendant's 'role' or position when he engaged in the fraud; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that misconduct will recur." *See, e.g.*, *SEC v. Patel*, 61 F.3d 137, 141 (2d Cir. 1995); *SEC v. First Pac. Bancorp*, 142 F.3d 1186, 1193 (9th Cir. 1998).

In 2007, the District Court for the District of Columbia laid out the factors to use in determining "unfitness":

> (1) the nature and complexity of the scheme; (2) the defendant's role in the scheme; (3) the use of corporate resources in executing the scheme; (4) the defendant's financial gain (or loss avoidance) from the scheme; (5) the loss to investors and others as a result of the scheme; (6) whether the scheme represents an isolated occurrence or a pattern of misconduct; (7) the defendant's use of stealth and concealment; (8) the defendant's history of business and related misconduct; and (9) the defendant's acknowledgment of wrongdoing and the credibility of his contrition.

*SEC v. Levine*, 517 F. Supp. 2d 121, 145-46 (D.D.C. 2007).

44

However, several courts have continued to apply the *Patel* factors, even post-Sarbanes-Oxley, suggesting that there is not a significant difference between the two tests.[22]   Furthermore, no Court of Appeals has determined which test would apply to conduct that occurred pre-Sarbanes-Oxley.

### 2.   Analysis

The Court concludes that even the more onerous, pre-Sarbanes test weighs in favor of imposing a bar. The Court has already discussed most of these factors, *see supra*, in its analysis of injunctive relief.   For example, the Court has determined that the scheme was complex and egregious, involving misrepresentations to company accountants and shareholders, and that Miller had a high degree of scienter. *See Patel*, 61 F.3d at 141; *Levine*, 517 F. Supp. 2d at 145-46.   Miller also used stealth and concealment in his wrongdoing. *See Levine*, 517 F. Supp. 2d at 145-46. (Pl.'s Br. [142] at 17.)   The Court has also determined that the Plan was not merely an isolated occurrence. *See Levine*, 517 F. Supp. 2d at 145-46. Miller's role was central, as he was the CEO, the scheme was his idea, and only he took part in the telephone conversations with the division presidents. *See id.* The Court also determined that there

---

[22] *See, e.g.*, *SEC v. Patterson*, No. 03-CV-0302-CVE-PJC, 2006 WL 770626, at *3 (N.D. Okla. Mar. 23, 2006); *SEC v. Henke,* 275 F. Supp. 2d 1075, 1086 (N.D. Cal. 2003); *SEC v. Global Telecom Servs., L.L.C.*, 325 F. Supp. 2d 94, 121 (D. Conn. 2004).

was substantial loss to investors and significant risk to investors of substantial losses, *see supra*. *See id.*

While Miller's actual gains were not substantial, he had a significant economic stake in the outcome, as he hoped to achieve large gains. *See id.; Patel*, 61 F.3d at 141. He also had a prior securities infraction: he was sanctioned in 1986 by the Louisiana Commissioner of Securities for the sale of unregistered securities and suspended from any involvement in the securities business in the State of Louisiana from August 28, 1986 to December 19, 1986. (Reply [148] at 21 n.9.) *Levine*, 517 F. Supp. 2d at 145-46; *Patel*, 61 F.3d at 141.

Most importantly, Miller has shown no contrition, as he is vehement in his denial of any wrongdoing. (*See* Pl.'s Br. [142] at 18.) *Levine*, 517 F. Supp. 2d at 145-46. Indeed, Miller's constant finger-pointing, rationalizations, and self-pity are both unattractive and a cause for concern as to the future likelihood of his behaving responsibly and honorably, should he acquire a position of great corporate responsibility.

In short, because Miller intends to continue as an entrepreneur and to work on high-stakes business ventures, there is a likelihood that the violations could recur. *See Patel*, 61 F.3d at 141. The Court therefore concludes that Miller should be subject to an officer and director bar, as the SEC has proved his substantial

46

unfitness for being an officer or director of a publicly traded corporation.

The question is the duration of the bar.  The SEC argues for a lifetime bar.  Given Miller's age and the stigma that attaches to any such bar, it is likely that whatever the length of this Court's bar, it will act effectively as a lifetime bar.  Nevertheless, the Court believes that it should try to assess a period that will be proportional to the conduct here.  The Court concludes that a bar of approximately 15 years would be appropriate on these facts. Yet, even though the defendant clearly aspired to a corporate position during the pendency of this case, he has not served in any responsible position in a publicly-traded corporation in the last 10+ years. Thus, the defendant has already effectively served over 10 years of any bar period that would have been imposed had this case been resolved closer to the time of the offense conduct.

Accordingly, the Court will give the defendant credit for this time when he was largely absent from the corporate world and will now prospectively impose a 5-year bar.

## CONCLUSION

For the above reasons, the Court issues: (1) a permanent injunction enjoining defendant (his agents, servants, employees, attorneys, and all persons in active concert or participation with them) from violating Section 17(a) of the Securities Act; Section 10(b) of the Exchange Act and Rule 10b-5 thereunder; and Section

47

13(b)(5) of the Exchange Act and Rule 13b2-1 thereunder; and enjoining defendant from aiding and abetting violations of Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-13 thereunder and Section 13(b)(2)(A) of the Exchange Act; (2) a civil penalty in the amount of $75,000 and (3) a director and officer bar of five (5) years.

SO ORDERED, this *30* day of *September* , 2010.

_____
JULIE E. CARNES
CHIEF UNITED STATES DISTRICT JUDGE

48